**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-2666

_____

United States of America,      *
                                         *

    Appellee,               *  Appeal from the United States
                                     *  District Court for the Western
    v.                        *  District of Missouri.
                                     *

James Hubert Cain, Jr.,      *
                                         *

    Appellant.             *

_____

Submitted:  January 13, 1997

Filed:  November 12, 1997
_____

Before LOKEN, BRIGHT, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

After a five-day trial in 1996, a jury convicted James Hubert Cain, Jr., of one count of conspiracy to commit mail fraud, two counts of mail fraud, and four counts of interstate transfer of money obtained by fraud. (For reasons that we cannot discern, the judgment reflects convictions on one count of conspiracy to commit mail fraud and on three counts each of mail fraud and interstate transfer of money obtained by fraud. The indictment, the jury instructions, and the verdict forms, however, all show the configuration of charges that we listed above.) The trial court sentenced Mr. Cain to 51 months in prison and to restitution of $508,096.61.

Mr. Cain appeals his convictions, arguing that the evidence was insufficient, that certain hearsay was improperly admitted as coconspirator statements, and that the trial court erred in refusing to give a proffered jury instruction on "honest opinions" and "mere puffing."  Mr. Cain also appeals his sentence, contending that the amount of loss, and thus his guidelines range and the amount of restitution that he owes, was determined incorrectly.  We grant Mr. Cain's motion to file an untimely reply brief. We affirm Mr. Cain's conviction but remand for resentencing.

I.

The essence of the charges was that Mr. Cain conspired with others to induce several people to invest in the company of which he was president by knowingly misrepresenting to them, in documents and in person, that their investments were guaranteed by an escrow fund that would be used to buy government bonds.  In reality, no money was ever placed in escrow for the purchase of bonds, and no bonds were ever bought.  The individual counts of the indictment related to specific correspondence and money transfers executed during the relevant events.  Mr. Cain characterizes his defense in several different ways, but all of them amount to the basic assertions that he had no intent to defraud, that any of his own representations alleged to be fraudulent were instead merely predictions, projections, and opinions about events to occur in the future, and that he had no knowledge of the falsity of any representations made by others.

Witnesses variously described Mr. Cain, who held the title of president of the company as of mid-July, 1993, as the person "people would go to" "whenever there was a problem, when things became chaotic," the person who "was supposed to be basically in charge of the day-to-day operations," and the person "to look to ... for direction for the company, for control of the company."  According to one witness, Mr. Cain described himself by saying, "I run this operation ... if ... you need a decision made, I am the boss."  Mr. Cain once directed another witness "to come to him on any matters concerning the company ... or problems and things like that."  As president,

Mr. Cain "had complete access to all of the books and records of the company" and "controlled ... all distributions of funds."

In July or August, 1993, according to the chief executive officer of the company, several individuals in the company began to revise the written materials used in meetings with prospective investors. Among those documents was a summary sheet (so designated by the parties) stating that each investment "_is_" guaranteed "by the purchase and escrow deposit of government securities" (emphasis supplied). According to the chief executive officer, Mr. Cain was among those who contributed to the content of the revised summary sheet and had the entire original summary sheet before him when he did so. According to the chief executive officer, Mr. Cain knew at that time that "there was no guaranty fund in place."

Marion Johnson testified that she attended a prospective investors' meeting in September, 1993, where Mr. Cain stated to her, with respect to investment in the company, that "yes ... the principal ... _is_ safe" (emphasis supplied). An advertising consultant testified that she attended the same meeting and that the revised summary sheet was distributed at that meeting. The advertising consultant's own notes from that meeting reflect that the "principal _is_ protected by zero coupon bonds ... [and] [i]n effect, the principal _is_ guaranteed" (emphasis supplied). A tax accountant testified that Mr. Cain "went through" the prospectus and the revised summary sheet "in great detail" with Ms. Johnson and "[r]epeatedly" emphasized the escrow fund. That evening, Ms. Johnson signed releases for almost $250,000 in insurance and annuity proceeds, to be transferred to the company.

The chief financial officer of the company testified that after the meeting with Ms. Johnson, Mr. Cain and several others discussed how to use the money that they would receive from Ms. Johnson. The group decided, first, to pay outstanding bills of approximately $90,000 and, second, to "establish[] and fund[] ... the guaranty fund." Obviously, then, the escrow fund still did not exist in September, 1993. Nor "was there

any surprise expressed" by Mr. Cain during those post-meeting discussions "that the account for the guaranty fund had not already been funded," according to the chief financial officer.  The company paid the bills in question but did not establish the escrow fund, even though the chief financial officer asked both Mr. Cain and the chief executive officer about it again.  At that time, the chief executive officer instructed the chief financial officer "to wait"; Mr. Cain made no objection.

Other meetings were held with prospective investors in the fall of 1993.  Donald and Eva Jantz testified that they attended one meeting where Mr. Cain was present and that they were given a copy of the revised summary sheet.  They further testified that in reliance on the revised summary sheet, they invested $10,000 in the company.  Robert Ross testified that he and his mother attended a meeting at which Mr. Cain was present.  The revised summary sheet was distributed on that day as well.  At a subsequent meeting where Mr. Cain was also present, Mr. Ross's mother invested $10,000 in the company.  Finally, Charles Heiman testified that he and his wife attended one meeting where Mr. Cain was present.  The revised summary sheet was also distributed at that meeting.  Mr. and Mrs. Heiman invested $10,000 in the company on that day.

The chief financial officer testified that after all of these meetings, he asked Mr. Cain and the chief executive officer "almost daily" about "whether or not the guaranty fund should have any money put into it." Mr. Cain always "pass[ed] the  buck back" to the chief executive officer, never directed that the escrow fund be established, and in fact instructed the chief financial officer "to spend money for other purposes."  In spite of those circumstances, the chief executive officer testified, Mr. Cain "represented to the investors that there was a fund" and in fact "emphasized that with ... the ... investors."

We believe that the evidence is more than sufficient to show that Mr. Cain colluded with others to induce several people to invest in the company of which he was

president by misrepresenting to them that their investments would be completely safe because of the existence of an escrow fund that was used to buy government bonds, at times when he knew that no such escrow fund or bonds existed.  See, e.g., Atkinson v. United States, 344 F.2d 97, 99-100 (8th Cir. 1965), cert. denied, 382 U.S. 867 (1965), and Morris v. United States, 7 F.2d 785, 792-93 (8th Cir. 1925), cert. denied, 270 U.S. 640 (1926); see also United States v. Kaplan, 554 F.2d 958, 963-64 (9th Cir. 1977) (per curiam), cert. denied, 434 U.S. 956 (1977), and United States v. Hartenfeld, 113 F.2d 359, 361-62 (7th Cir. 1940), cert. denied, 311 U.S. 647 (1940).  We turn, then, to Mr. Cain's other contentions.

## II.

The trial court made a finding pursuant to United States v. Bell, 573 F.2d 1040, 1043-44 (8th Cir. 1978), that a conspiracy existed, that Mr. Cain was a member of that conspiracy, that certain statements were made by other conspirators during the course of the conspiracy and in furtherance of it, and, therefore, that those statements were admissible under Fed. R. Ev. 801(d)(2)(E).  On appeal, Mr. Cain first argues that no conspiracy existed.  We reject that contention in light of our discussion on the sufficiency of the evidence.

In the alternative, Mr. Cain asserts that certain statements admitted under Fed. R. Ev. 801(d)(2)(E) were in fact not coconspirator statements within the meaning of the rule.  Mr. Cain does not specify the exact statements to which he objects.  The gist of his argument seems to be, however, that any statements made after November, 1993, could not have been coconspirator statements, since by that time the conspirators (for our purposes, Mr. Cain, the chief executive officer, and the chief financial officer) were antagonistic to one another.

We have carefully read the transcript of the trial.  There are very few "statements" within the meaning of the rules dealing with hearsay, see especially Fed. R. Ev. 801(a)(1), 801(c), 802, 805, 806, and we believe their admission to be

harmless error, if error at all.  <u>See</u>, <u>e.g.</u>, <u>United States v. Smith</u>, 550 F.2d 277, 282 (5th Cir. 1977), <u>cert.</u> <u>denied</u>, 434 U.S. 841 (1977).  We therefore reject Mr. Cain's assertions on this issue.

Mr. Cain also contends that the trial court improperly refused to give a jury instruction on "honest opinions" and "mere puffing."  In the first place, such an instruction was inapplicable to the misrepresentation with respect to the present existence of an escrow fund.  In the second place, however, we note that the trial court did give jury instructions requiring proof of "affirmative representations or omissions" and allowing the jury to accept a defense of "good faith," "opinion[s] honestly held," and "honest mistake[s] in judgment."

In our view, the jury instructions (including the verdict director, to which Mr. Cain also objects), taken as a whole, fairly and adequately contained the applicable law, <u>see</u>, <u>e.g.</u>, <u>United States v. Casas</u>, 999 F.2d 1225, 1230 (8th Cir. 1993), <u>cert.</u> <u>denied</u>, 510 U.S. 1078 (1994), and covered the essence of Mr. Cain's proffered instruction, <u>see</u>, <u>e.g.</u>, <u>United States v. Bettelyoun</u>, 16 F.3d 850, 853 (8th Cir. 1994).  We therefore reject Mr. Cain's contentions on this issue as well.

III.

At the sentencing hearing, the trial court found that the conspiracy, "as alleged in the indictment," existed from December, 1992, to December, 1993, and that Mr. Cain, "even though he was a late comer[]," was "responsible for all of the money obtained during the conspiracy."  That amount, the trial court found, was $508,096.61.  That total was the sum of $298,851.61 for the stock transactions at issue during the trial, $55,200.00 for other stock sales (not at issue during the trial but made by the chief executive officer and the chief financial officer, both of whom pleaded guilty as conspirators), and $154,045.00 for stock sales between March and December, 1993, made by a commissioned stockbroker.

On appeal, Mr. Cain argues that the evidence failed to show that he knew about the $55,200.00 in other stock sales or about the $154,045.00 in stock sales made by the commissioned stockbroker (who was acting, according to Mr. Cain, at the direction of the chief executive officer and the chief financial officer).  In the alternative, Mr. Cain asserts that since he did not join the company until mid-July, 1993, he should not be held responsible for any stock sales before that time.

The chief financial officer of the company testified that money began "coming in" from stock sales in early March, 1993.  Those sales, he stated, were made by him, the chief executive officer, and the commissioned stockbroker.  The chief executive officer testified that he first met Mr. Cain  "sometime in March or April," 1993, and talked with him over "two or three months" "about ... becoming involved in the company."  During that time, according to the chief executive officer, Mr. Cain "had total access to the office" and "the company books and records."

Also during that time, the chief executive officer stated, he discussed with Mr. Cain in "great detail" the sales that the commissioned stockbroker was making, since the chief executive officer considered the commissioned stockbroker "a major pain in my side."  Mr. Cain told the chief executive officer that "he was going to be [a] hatchet man" and "fix" the situation with the commissioned stockbroker, who was allegedly being paid exorbitant commissions.  The chief executive officer also testified that he discussed with Mr. Cain "the issues with the bond fund," presumably that one did not exist, despite misrepresentations to the contrary in the original summary sheet, which, as revised in other sections, was used during meetings with prospective investors.

The company actually hired Mr. Cain in mid-July, 1993.  According to the chief financial officer, after Mr. Cain was hired, he "made himself very familiar with the financial status of the company in terms of ... cash flow, ... liabilities, [and] ... sources of income."  He did so by going through "the books and records of the company."

Mr. Cain especially "wanted to know on a daily basis what the cash balance[s] in the various checking accounts were." Mr. Cain also knew, after that time, according to the chief financial officer, about the commissioned stockbroker's sales, because on "one occasion ... there was a rather heated telephone exchange ... between [the commissioned stockbroker] and [another company officer], and Mr. Bert Cain was present. And following that altercation there was discussion between myself and [the other officer and Mr. Cain] relating to the specific circumstances relating to [the commissioned stockbroker]."

Under the federal sentencing guidelines, the relevant conduct, and hence base offense level, for a participant in a conspiracy is determined by reference to "all acts and omissions committed, aided, abetted, ... or willfully caused by the defendant ... [and] all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." See U.S.S.G. § 1B1.3(a)(1)(A), § 1B1.3(a)(1)(B). "A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant's joining the conspiracy, even if the defendant knows of that conduct." See U.S.S.G. § 1B1.3, application note 2, ¶ 8.

We have no difficulty concluding, from the evidence recounted, that when Mr. Cain was hired in mid-July, 1993, he knew of the stock sales made by the chief executive officer, the chief financial officer, and the commissioned stockbroker. From that knowledge, it is reasonable to conclude as well that future stock sales by those three people were foreseeable to Mr. Cain. Nor is it irrational to believe that Mr. Cain knew in mid-July, 1993, of the original summary sheet's misrepresentation that an escrow fund existed and also knew that, in fact, no such fund did exist. From that knowledge, we may infer that as of mid-July, 1993, Mr. Cain agreed, at least tacitly, to the use of that assertion in the revised summary sheet in future stock sales, whether he or the other three persons in question made those sales.

We do not see any evidence in the record before us, however, that justifies the conclusion that Mr. Cain joined the conspiracy during the months between March and July, 1993. Specifically, we cannot extract from the record before us, except by resort to raw speculation, the conclusion that Mr. Cain agreed, before he was hired, to the use of either the original or the revised summary sheet in future stock sales. We reverse, therefore, the attribution to Mr. Cain of any stock sales before mid-July, 1993. Accordingly, we vacate the sentence in this case and remand for limited additional proceedings to determine an appropriate guidelines range for Mr. Cain and the amount of restitution that he owes.

IV.

For the reasons stated, we affirm Mr. Cain's conviction but remand his case for limited further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.