# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1550
_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| John Bad Wound, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: October 22, 1999

Filed: February 16, 2000
_____

Before WOLLMAN, Chief Judge, ROSS and LOKEN, Circuit Judges.
_____

WOLLMAN, Chief Judge.

John A. Bad Wound appeals from his conviction for various offenses resulting from his participation in a scheme to defraud Oglala Lakota College (the College) through the use of phony office supply companies, and from the resulting sentence imposed by the district court. We affirm Bad Wound's convictions, vacate his sentence, and remand for resentencing.

**I.**

The College is a federally funded institution of post-secondary education located on the Pine Ridge Indian Reservation in South Dakota. From 1990 to 1996, Bad Wound was professionally associated with the College in various capacities. In 1990 and 1991, Bad Wound periodically performed financial consulting work for the College, but had no consistent employment relationship with it. This changed in January of 1992, when the College hired Bad Wound to manage its accounting department. He served in this capacity until March of 1995, at which time he was promoted to vice-president of business affairs, a position that he held until his departure from the College in 1996.

At some point during Bad Wound's association with the College, he became involved in a fraudulent scheme initially hatched in 1991 by Arlynn Knudsen, the College's vice-president of business affairs from 1991 to 1995. Under this scheme, Knudsen, Bad Wound, and several other individuals, including Margaret Minko-Bad Wound, whom Bad Wound held out to be his wife, formed nine phony supply companies. These companies, which generally conducted no legitimate business and existed as bank accounts only, billed the College for supplies that it never received. The College, acting through Knudsen, issued checks for the non-existent supplies, which were then deposited in the bank accounts of the phony businesses, ultimately for the benefit of the conspirators. From 1991 to 1995, the College paid a total of $2,657,032.06 to the conspirators through the fraudulent companies.

In October 1991, Bad Wound personally created one of the supply companies, Territorial Office Products (Territorial), which engaged in at least some legitimate business with the College through June of 1993. Minko-Bad Wound, at the direction of Bad Wound, created two others, Rapid Office Products (Rapid) and Greenway. These two companies, unlike Territorial, were mere conduits of fraud from their respective formations in September and October of 1992. Overall, Bad Wound and Minko-Bad Wound

personally received $174,488.92 in fraudulently obtained funds through their three companies.

In early 1997, Bad Wound and his co-conspirators' web of deceit unraveled, and they were indicted on numerous violations of federal law. Bad Wound was charged with conspiracy, 18 U.S.C. § 371, theft from an Indian tribal organization, 18 U.S.C. § 1163, theft of federal funds, 18 U.S.C. § 666, transportation of stolen money, 18 U.S.C. § 2314, money laundering, 18 U.S.C. § 1956(a)(1), transacting in property derived from unlawful activity, 18 U.S.C. § 1957, tax evasion, 26 U.S.C. § 7201, and criminal forfeiture, 18 U.S.C. § 982. Bad Wound pleaded not guilty to all counts. Following a four-day trial, the jury returned a verdict of guilty on all counts, and Bad Wound was sentenced to 151 months' imprisonment and three years of supervised release.

## II.

Bad Wound first challenges his conviction, arguing that the district court erred in admitting the testimony of Minko-Bad Wound at trial. Prior to trial, Bad Wound moved to exclude Minko-Bad Wound's testimony on the basis of the adverse spousal testimony privilege. He also sought to question Minko-Bad Wound out of the jury's presence regarding her awareness of the privilege and whether she wished to assert it. The court denied both the motion and the request. At trial, Bad Wound renewed his objection, but it was once again denied. Minko-Bad Wound, with apparent reluctance, then offered testimony harmful to Bad Wound's defense, stating that he was part of the illegal scheme and that she had opened the Rapid and Greenway accounts pursuant to his direction.

We review the district court's admission of testimony for an abuse of discretion. See United States v. Fregoso, 60 F.3d 1314, 1326 (8th Cir. 1995). Because we find that Minko-Bad Wound waived her testimonial privilege, we affirm the court's ruling.

Federal courts recognize two distinct marital privileges under Rule 501 of the Federal Rules of Evidence: the marital confidential communication privilege and the adverse spousal testimony privilege. See United States v. Jackson, 939 F.2d 625, 627 (8th Cir. 1991). Under the adverse spousal testimony privilege, the privilege at issue in this case, an individual "may be neither compelled to testify nor foreclosed from testifying" against the person to whom he or she is married at the time of trial.[1] Trammel v. United States, 445 U.S. 40, 53 (1980) [100 S.Ct. at 914]; see also Jackson, 939 F.2d at 627. The privilege therefore rests with the testifying spouse, who may waive the privilege without the consent of the defendant spouse. See Trammel, 445 U.S. at 53.

Minko-Bad Wound entered into a plea agreement following her indictment for her involvement in the supply company scheme. Under the terms of the agreement, Minko-Bad Wound pleaded guilty to six of the charged counts in return for the dismissal of the remaining counts and her promise to provide "complete and truthful testimony before grand juries, at trial, and at other proceedings as required."

Bad Wound argues that the agreement lacks the specificity necessary to support a finding of a voluntary waiver of the testimonial privilege. We do not agree. The First Circuit recently suggested that a broadly phrased consent to full discovery contained within a plea agreement might constitute a waiver of the adverse spousal testimony privilege. See United States v. Yerardi, 192 F.3d 14, 18 (1st Cir. 1999). This suggestion is consistent with our recognition that a plea agreement that states in general terms the defendant's obligation to cooperate with the government can constitute a waiver of the defendant's Fifth Amendment privilege against self-incrimination. See

---

[1]The record is unclear whether Bad Wound and Minko-Bad Wound were legally married under South Dakota law at the time of trial, largely because the validity of their marriage was never challenged at the district court level. Because of our holding that Minko-Bad Wound waived any adverse spousal privilege that she may have possessed, we assume for purposes of this appeal that she and Bad Wound were legally married at the time of trial.

United States v. Lawrence 918 F.2d 68, 72 (8th Cir. 1990); see also United States v. Resto, 74 F.3d 22, 27 (2nd Cir. 1996). If a broadly phrased plea agreement can effectively waive a constitutional right, we are satisfied that it can also waive an evidentiary privilege based purely on policy considerations, such as the one at issue here. See Trammel, 445 U.S. at 44 (discussing the policy rationale underlying the adverse spousal testimony privilege).

With respect to the voluntariness of the waiver, we note that Minko-Bad Wound was represented by counsel throughout the plea negotiations and that the plea agreement itself advised her that by entering into the agreement she would be "waiving certain statutory and constitutional rights to which she is otherwise entitled." We conclude that these are substantial indicia of voluntariness. See Wallin v. Minn. Dep't of Corrections, 153 F.3d 681, 689-90 (8th Cir. 1998); Pilon v. Univ. of Minn., 710 F.2d 466, 467-68 (8th Cir. 1983). Accordingly, we find that Minko-Bad Wound validly waived her testimonial privilege, a finding that is not vitiated by the district court's denial of Bad Wound's request to question Minko-Bad Wound out of the jury's presence regarding the privilege. Although in United States v. Jackson we quoted the witness's sequestered testimony in upholding a finding that the witness had voluntarily waived the privilege, we did not hold that such testimony is essential to a finding of voluntariness. See 939 F.2d 625, 627 (8th Cir. 1991). Here, there is non-testimonial evidence of voluntariness--a plea agreement entered into with the aid of counsel--that was not present in Jackson.

In sum, the district court did not abuse its discretion in admitting Minko-Bad Wound's testimony.

**III.**

Bad Wound also challenges his sentence. The district court sentenced Bad Wound to three concurrent terms of imprisonment, the longest of which--151 months--

was based on Bad Wound's convictions for money laundering and transacting in property derived from an illegal activity.[2]  In determining Bad Wound's sentence for these offenses, the court attributed to Bad Wound $2,657,032.06, which represents the combined loss caused by all nine of the bogus supply companies.  Relying on this figure, the court added a six-level enhancement to Bad Wound's base offense level pursuant to U.S.S.G. § 2S1.1(b)(2)(G), which calls for such an enhancement for money laundering convictions involving funds in excess of $2,000,000.  "We review the district court's factual findings for clear error, and its application of the sentencing guidelines de novo."  United States v. Hunt, 171 F.3d 1192, 1195-96 (8th Cir. 1999).

## A.

Bad Wound first contends that the court's attribution of $2,657,032.06 was erroneous because the loss caused by the six phony supply companies formed by his co-conspirators was distinct from the loss brought about by his three companies.  Thus, Bad Wound asserts that only the loss caused by his three companies, $174,488.92, should be considered in determining the proper level enhancement under U.S.S.G. § 2S1.1(b)(2).  We disagree.

The sentencing guidelines provide that in the case of "jointly undertaken criminal activity," a defendant is responsible for "all reasonably foreseeable acts . . . of others in furtherance of the jointly undertaken activity."   U.S.S.G. § 1B1.3(a)(1)(B).  Accordingly, a defendant convicted of conspiracy is properly held accountable for all reasonably foreseeable acts of co-conspirators advancing that conspiracy. See United States v. Molina, 172 F.3d 1048, 1057 (8th Cir. 1999); United States v. Brown, 148 F.3d 1003, 1008 (8th Cir. 1998).  "Factors relevant to foreseeability include whether

---

[2]Bad Wound was also sentenced to 60 months' imprisonment for his conspiracy, theft from a tribal organization, theft of federal funds, and tax evasion convictions, and 120 months for his transportation of stolen monies conviction.

the defendant benefited from his co-conspirator's activities and whether he demonstrated a substantial level of commitment to the conspiracy." Id.; see also United States v. Fairchild, 122 F.3d 605, 613 (8th Cir. 1997).

Bad Wound was convicted of conspiring to defraud the College through the use of phony supply companies. The evidence demonstrates that Bad Wound benefited, albeit indirectly, from his co-conspirators' activities to advance this scheme. Although Bad Wound did not realize financial gain directly from the phony companies not under his control, his co-conspirators' acts in furtherance of the overall scheme enabled him to receive illicit funds through his own companies, thereby benefitting him substantially. For example, Knudsen issued checks on behalf of the College to each of the nine bogus companies, including Bad Wound's, knowing that the College was receiving nothing in return. Also, co-conspirator Daniel Banuelos, an accountant hired by Knudsen to perform audits of the College's accounts, buried in the College's financial reports all transactions involving the nine companies so that the College's administrators would not detect any missing funds.

The evidence also suggests that Bad Wound was substantially committed to the overall scheme and not just as it related to his three companies. Most notably, Knudsen testified that in 1995 he and Bad Wound conversed about the possibility of Bad Wound's destroying canceled checks and vendor records to cover any remaining vestiges of their scheme.

Finally, we note the similarities between this case and United States v. Atkins, in which we found that the acts of a co-conspirator were reasonably foreseeable to the defendant because the defendant and his co-conspirator shared a close working relationship and because the acts of fraud committed by each individual were remarkably similar. See 25 F.3d 1401, 1404 (8th Cir. 1994). Both of these elements also exist here. From 1992 to 1995, Bad Wound and Knudsen worked in the same department and Bad Wound, in the words of Knudsen, was his "right hand . . . to make

sure the operations, accounting structure, specifically, was maintained." In addition, Bad Wound and the other conspirators employed nearly identical means to defraud the College: all used phony supply companies, received checks issued by Knudsen, and had Banuelos conceal the transactions in the College's financial records.

In sum, the acts of his co-conspirators were reasonably foreseeable to Bad Wound and were in furtherance of the supply company scheme. Accordingly, the district court did not err in finding that the loss caused by the co-conspirators' companies was not independent from that caused by Bad Wound's companies.

## B.

Bad Wound also argues that, even if the loss caused by his companies was generally indistinct from the loss caused by the others, a substantial portion of the combined loss occurred prior to his joining in the illegal scheme and therefore should not be considered in determining the proper level enhancement under U.S.S.G. § 2S1.1(b)(2).

"[A] person cannot be held liable for the losses caused by other conspirators in the scheme prior to the time the person entered the conspiracy." United States v. Oseby, 148 F.3d 1016, 1026 (8th Cir. 1998); see also U.S.S.G. § 1B1.3, application note 2, ¶ 8. We applied this principle in United States v. Cain, a case similar to this one. 128 F.3d 1249 (8th Cir. 1997). There, the district court found that a fraudulent stock sale conspiracy existed from December of 1992 to December of 1993, and that the defendant "was a late comer" to the conspiracy. Id. at 1252. Nonetheless, the court attributed all of the money obtained during the conspiracy to the defendant for sentencing purposes. Id. We reversed, concluding that because the record contained no evidence that the defendant joined the conspiracy before July of 1993, the district court erred in attributing to the defendant any fraudulent sales made prior to that time. Id. at 1253.

Here, the district court made no finding regarding the precise time that Bad Wound joined the conspiracy. The court found that Knudsen, Banuelos, and Jerry Godfrey began the supply company scheme on or about June 12, 1991, and that Bad Wound did not join until a later time. The court made no specific finding regarding the latter date, and there is insufficient evidence in the record from which we can determine precisely when Bad Wound entered the conspiracy. The close working relationship between Bad Wound and Knudsen suggests that Bad Wound may have already joined the conspiracy in January of 1992, when he was hired by the College. Alternatively, there is evidence that Bad Wound may not have entered the scheme until September of 1992, when he and Minko-Bad Wound formed Rapid. Then again, there is evidence that Bad Wound may have initially formed Rapid and Greenway without knowledge of Knudsen's scheme and that Bad Wound did not join the conspiracy until mid-1994, following a conversation in which he and Knudsen agreed to share the illicit profits from Bad Wound's companies.

In the absence of a finding regarding the time at which Bad Wound joined the conspiracy and in light of the lack of record evidence to establish that date, it is not possible for us to determine whether the district court correctly attributed to Bad Wound the total loss caused by the conspiracy. If Bad Wound joined the conspiracy immediately after being hired by the College, the attribution of the total loss would constitute harmless error, because from the commencement of the conspiracy until Bad Wound's hiring the College paid only $400,992 to the phony supply companies. After subtracting this sum from $2,657,032, the loss attributable to Bad Wound would still exceed $2,000,000 and would thus support the court's six-level enhancement. A finding that Bad Wound did not join the conspiracy until July of 1994, however, would have significant consequences for Bad Wound, for by that date the College had paid $2,072,622 to the companies not operated by Bad Wound. Subtracting this sum from the total loss would result in a loss attributable to Bad Wound of only $584,410, which would warrant only a three-level enhancement and result in an offense level of 31, with a sentencing range of only 108-135 months.

Accordingly, we vacate Bad Wound's sentence and remand for additional proceedings to determine the time at which Bad Wound joined the conspiracy and, based on this determination, the amount of loss that should be attributed to him under U.S.S.G. § 2S1.1(b)(2).

## IV.

The convictions are affirmed. The sentence is vacated, and the case is remanded to the district court for further factual findings and for resentencing in accordance therewith.

LOKEN, Circuit Judge, concurring.

In Part II, the court concludes that Minko-Bad Wound waived her adverse spousal testimony privilege when she entered into a plea agreement in which she promised to provide the government "complete and truthful testimony . . . as required." I am uncomfortable with this conclusion for two reasons. First, it is not clear from the face of the plea agreement that Minko-Bad Wound *knowingly* waived this rather obscure privilege, and the record does not reveal whether the privilege was discussed during plea agreement negotiations. Second, the court's analysis ignores a serious question -- whether a prior waiver of this privilege may be withdrawn at trial, as the waiver of the Fifth Amendment testimonial privilege was withdrawn in Stevens v. Marks, 383 U.S. 234 (1966). Assertion of the adverse spousal testimony privilege may well breach a plea agreement to cooperate, but that is not the same as concluding that a plea agreement waiver *may not be withdrawn*, so that the spouse's promise to testify can be specifically enforced.

In my view, we need not resolve these troublesome issues because Bad Wound failed to preserve them. The adverse spousal testimony privilege belonged to Minko-Bad Wound, not defendant Bad Wound. Therefore, when she proposed to testify

adversely to Bad Wound at trial, his only legitimate concern was whether she was knowingly and voluntarily waiving the privilege at that time. Bad Wound filed a motion in limine in which he proposed to question Minko-Bad Wound outside the presence of the jury regarding the waiver issue. The district court cryptically denied this motion prior to trial, and again when it was renewed at trial. We know from these rulings the court was unwilling to allow Bad Wound to pursue this evidentiary issue outside the presence of the jury, a ruling clearly within the court's broad discretion. Bad Wound did not inquire whether the court would have permitted (or conducted itself) a voir dire of Minko-Bad Wound prior to her adverse testimony to clarify whether she understood the adverse spousal testimony privilege and was voluntarily waiving it. Thus, Bad Wound waived the only issue he had standing to raise, and his attack on the admissibility of Minko-Bad Wound's testimony must be rejected.

I join the remainder of the court's opinion and its decision to affirm.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-11-