**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

JAMES WILBUR SCRUGGS, a/k/a Pretty,
a/k/a J,

            *Defendant-Appellant.*

No. 03-4174

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CR-99-200)

Argued: December 5, 2003

Decided: January 23, 2004

Before WILKINS, Chief Judge, and WILKINSON and
MOTZ, Circuit Judges.

———————

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Chief Judge Wilkins and Judge Wilkinson joined.

———————

**COUNSEL**

**ARGUED:** Charles Arthur Gavin, BLACKBURN, CONTE, SCHIL-
LING & CLICK, P.C., Richmond, Virginia, for Appellant. Brian
Ronald Hood, Assistant United States Attorney, Richmond, Virginia,
for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney,
Richmond, Virginia, for Appellee.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

James Wilbur Scruggs entered into a plea agreement providing that he would "cooperate fully and truthfully with the United States, and provide all information known to [him] regarding any criminal activity." Despite this unequivocal obligation, Scruggs failed to inform the Government of a murder in which he had participated and gave conflicting and contradictory answers to investigators when asked about the murder. The Government moved to vacate the plea agreement and requested that all statements made by Scruggs pursuant to it be admissible against him at trial. The district court granted the Government's motion and ruled that the Government was entitled to the benefit of a provision in the agreement that permitted the use of Scruggs' statements at trial. We affirm.

I.

Scruggs is the cousin of co-conspirators Eugene, Travis, and Phillip Friend, the sons of Vallia Friend. On February 16, 1999, Scruggs assisted Travis and Eugene in the theft of an unattended truck carrying logs. At approximately the same time, Eugene began advancing a plan to steal a truck by force, drive to Texas, pick up a load of marijuana there, and then drive it back to the East Coast.

In furtherance of this plan, on the evening of February 28, 1999, the Friend brothers and Scruggs left the Friend home in an automobile and picked up Eugene's ex-girlfriend, Jackie Robinson. Scruggs had a .380 caliber firearm in his possession at the time. The group drove to the Shockoe Bottom section of Richmond, Virginia, where Eugene Friend spotted a parked truck. The driver of the truck, Leonard Cornforth, was sleeping inside.

The group parked behind the truck, and the Friend brothers and Scruggs got out and walked toward it, intending to perform the first step of Eugene's plan — to steal the truck by force. Eugene walked to the driver's side, Travis and Philip to the passenger side, and Scruggs stopped at the rear of the trailer to act as a lookout. Eugene

and Phillip began physically assaulting Cornforth, and then, upon Eugene's command, Travis used Scruggs' .380 caliber firearm to kill Cornforth. Because the shooting attracted the attention of passersby, the group gave up on their efforts to steal the truck and returned to their car with several items from Cornforth's truck. Shortly after the murder, a witness reported seeing Scruggs attempting to sell the .380 firearm.

After the Cornforth murder, Eugene continued to talk about his plans to hijack a truck to drive to Texas for a load of marijuana. Although Scruggs expressed a desire to accompany Eugene on this venture, he was not included in the Friend brothers' second attempt to steal a truck on April 25, 1999. As with the first attempt, the group (which also included Vallia Friend and Eugene's new girlfriend, Charlene Thomas) murdered the truck's driver, Samuel Lam. Unlike the first attempt, however, the Friend brothers' second attempt to hijack a truck by force was successful. After depositing Lam's body in a nearby swamp and unloading the truck's cargo of wholesale house plants in Richmond, the Friend brothers drove Lam's truck to Texas. According to Thomas, Scruggs was "upset that he didn't go" to Texas with the Friends. After learning that the Friend brothers had been arrested on their return from Texas, Scruggs sold some of the plants from Lam's truck and gave others to his girlfriend and mother.

One month later, Scruggs appeared before a grand jury. When asked under oath before the grand jury about the plants, Scruggs falsely testified that he had destroyed them. On June 21, 1999, the grand jury returned an indictment against Scruggs, charging him with conspiracy to interfere with commerce by violence, in violation of 18 U.S.C. § 1951(a) (2000); false declarations before the grand jury, in violation of 18 U.S.C. § 1623(a) (2000); and obstruction of justice, in violation of 18 U.S.C. § 1503(a) (2000).[1]

---

[1]Scruggs argues that this evidence is insufficient to convict him of conspiracy to interfere with commerce by violence in violation of 18 U.S.C. § 1951(a) (2000). On a sufficiency of evidence claim, we view the evidence in the light most favorable to the Government, to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *United States v. Butner*, 277 F.3d 481, 487 (4th Cir. 2002). Although Scruggs concedes "that there was sufficient

On July 6, 1999, Scruggs pled guilty to the false declarations count as part of a plea agreement with the Government providing that Scruggs would "cooperate fully and truthfully with the United States, and provide all information known to the defendant regarding any criminal activity." In return for this pledge of cooperation, the Government allowed Scruggs to plead guilty to the offense carrying the least penalty (a 5-year maximum, as opposed to 10- and 20-year maximums for the other two crimes); agreed not to "further criminally prosecute defendant in the Eastern District of Virginia for the specific conduct described in the indictment or statement of facts"; and agreed "not to use any truthful information provided pursuant to [the plea] agreement against the defendant in any other criminal prosecution against the defendant in the Eastern District of Virginia." On July 14, 1999, the district court accepted the plea agreement.

Soon thereafter, the Government called upon Scruggs to begin to fulfill his part of the plea agreement. On July 29, 1999, Scruggs helped investigators locate where the unattended truck carrying logs had been stolen. On October 26, 1999, Scruggs told investigators that sometime previously he had seen Eugene in possession of a black semiautomatic handgun, which Scruggs believed to be a .380 caliber. But at no time during these discussions, or during the two discussions that occurred prior to entering the plea agreement, did Scruggs provide any information to investigators about the Cornforth murder.

Several months later, Travis Friend agreed to cooperate with the Government. In the course of his cooperation, Travis disclosed in a

---

evidence to prove that a conspiracy to interfere with commerce by violence did exist," Brief of Appellant at 23, he contends that this evidence did not suffice to prove him guilty of knowingly participating in the conspiracy. In fact, the evidence outlined above clearly provides a sufficient basis for a jury to find that Scruggs knew about the Friend plan to hijack a truck to go to Texas, directly participated in the Friend brothers' hijacking attempt of Cornforth's tractor-trailer, expressed an ongoing desire after Cornforth's murder to participate in Eugene's plan to go to Texas, and obstructed justice with regard to law enforcement's investigation of the Friend brothers' hijacking murder of Samuel Lam. Therefore Scruggs' claim of insufficient evidence is meritless.

May 2000 interview that Scruggs had been involved in the Cornforth murder. Consequently, on June 6, 2000, investigators questioned Scruggs about the murder. The investigators did not advise Scruggs of his *Miranda* rights before questioning him on this issue, nor did they advise Scruggs' counsel of the new line of inquiry. Scruggs first denied knowledge of the incident, then admitted his involvement in the murder, then recanted and denied any knowledge, then gave a different version of the story regarding his involvement, and then, on June 11, again recanted through his attorney.

Believing that Scruggs had intentionally withheld information in breach of the plea agreement, the Government asked that Scruggs' conviction "be vacated, the plea agreement declared a nullity, and all provisions benefitting defendant . . . voided," but that "all statements made by defendant pursuant to the plea agreement [be] admissible against him at trial." The district court granted the Government's motion to vacate the conviction and ordered the plea agreement "rescinded." The court also ruled that the Government was "entitled to the benefit of paragraph 12," of the agreement, wherein Scruggs waived his ability to contest the admission of "statements [made] pursuant to this agreement or any leads derived therefrom" in the event he failed to "fulfill the obligations under th[e] plea agreement."

On February 20, 2002, a grand jury returned a superseding indictment charging Scruggs not only with the original three counts, but also with carjacking resulting in death, in violation of 18 U.S.C. §§ 2119(3) & 2. Scruggs moved to suppress his inculpatory statements of October 26, 1999 and June 6, 2000 and all statements made pursuant to and derived from the plea agreement, but the district court denied Scruggs' motion in a written opinion. The jury found Scruggs guilty on all four counts. The district court sentenced Scruggs to 240 months of incarceration on Count One, life imprisonment on Count Two, sixty months incarceration on Count Three, and 120 months incarceration on Count Four, all to run concurrently. Scruggs timely noted his appeal.

II.

Scruggs argues that the district court erred in "setting aside the original conviction" and vacating the plea agreement "because the

breach of the plea agreement was immaterial." Brief of Appellant at 12, 15.

Scruggs does not challenge the district court's finding that he breached his plea agreement with the Government. That agreement required Scruggs to "cooperate fully and truthfully with the United States, and provide all information known to the defendant regarding any criminal activity." Scruggs clearly failed to meet this requirement not only by failing to divulge any information about the Cornforth murder when questioned generally about the Friend family's criminal activity, but also by giving conflicting answers when directly asked about the murder on June 6, 2000. Scruggs also does not deny that both the plea agreement itself and black letter law "relieves the government of its obligation to conform to the agreement's terms" upon a material breach. *United States v. West*, 2 F.3d 66, 70 (4th Cir. 1993).

What Scruggs does deny is that his breach of the plea agreement was material. In doing so, Scruggs makes no claim of Government overreaching or constitutional violations. Rather, he relies entirely on contract law principles. *See United States v. Peglera*, 33 F.3d 412, 413 (4th Cir. 1994). Specifically, he relies on the general principle that an injured party may suspend performance and cancel an agreement upon a breach "only if the breach is *material*, that is, sufficiently serious to warrant this response." 2 E. Allan Farnsworth, Farnsworth on Contracts ("Farnsworth") § 8.15, at 489 (2d ed. 1998) (emphasis in original); *see, e.g.*, *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1143 (9th Cir. 2003) (noting that a breach will justify ending an agreement "only when it is of so material and substantial a nature that [it] affect[s] the very essence of the contract") (internal quotation marks and citations omitted).

Central to determination of the materiality of a breach is "the extent to which the injured party will be deprived of the benefit which he reasonably expected." Restatement (Second) of Contracts ("Restatement") § 241 (1981); *see also United States v. Kelly*, 337 F.3d 897, 901-02 (7th Cir. 2003) (applying this factor in determining the materiality of a defendant's breach of a plea agreement); *United States v. Holbrook*, 207 F. Supp. 2d 472, 475 (W.D. Va. 2002) (same); 2 Farnsworth § 8.16, at 496 (describing this factor as the "[m]ost significant" in determining materiality).

A primary benefit the Government contracted for and reasonably expected from the plea agreement was Scruggs' full and truthful cooperation in providing all information known to him regarding any criminal activity. This it indisputably did not get.

Scruggs nonetheless argues that his breach was not material because the Government assertedly did not suffer any injury from his breach. At the time of the breach, according to Scruggs, Eugene and Phillip Friend would still have faced trial for the Cornforth murder on the basis of Travis Friend's testimony. Further, Scruggs maintains that his testimony would have been "nominal in value" in the July 2000 trial of Vallia Friend for the Lam murder. Brief of Appellant at 14. Scruggs dismisses as "speculative" the Government's contention that Scruggs' breach of the plea agreement forced the Government to obtain information about the Cornforth murder by entering into a plea agreement with Travis Friend, thereby preventing the Government from pursuing the death penalty against Travis Friend, the "trigger-man" in both the Lam and Cornforth murder. *Id*. at 15.

Scruggs' arguments improperly shift the focus from the benefits the Government reasonably expected from the plea agreement (i.e., Scruggs' truthful testimony) to Scruggs' perception of the possible utility of these benefits to the Government. As one of our sister circuits has recently noted in a case involving a defendant's breach of his plea agreement, "[t]he standard for assessing the reasonable expectations of the parties is an objective one, and so [the defendant's] subjective beliefs about the utility of his cooperation is simply not relevant to our inquiry." *Kelly*, 337 F.3d at 902 (citation omitted).

There *might* be some criminal activities about which Scruggs could plausibly argue the Government would not have been objectively reasonable in expecting him to provide information pursuant to the plea agreement. He cannot so contend, however, with respect to murders committed by his alleged co-conspirators in furtherance of the very conspiracy at issue in the plea agreement. Scruggs' breach in this regard certainly "affect[ed] the very essence of the contract." *Warren*, 328 F.3d at 1143 (internal quotation marks and citation omitted). As the district court properly noted, "the United States bargained for complete and truthful cooperation so that it could make its decisions

in perspective of that truthful and complete cooperation, and what it was deprived of was the right and the benefit to do precisely that."

Accordingly, Scruggs' initial contention fails.

### III.

Scruggs also argues that the district court erred when it denied his motion to suppress the inculpatory statements that he made pursuant to the plea agreement.

After finding that Scruggs had breached the plea agreement, the court declared the agreement "rescinded" and Scruggs' conviction vacated. The court then permitted the Government to use at trial statements Scruggs had provided pursuant to the plea agreement. The court reasoned that paragraph 12 of the plea agreement provided this benefit to the Government and barred Scruggs from contesting the admissibility of such statements. Paragraph 12 provides:

> If the defendant fails to fulfill the obligations under this plea agreement, the defendant shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(e)(6) of the Federal Rules of Criminal Procedure, or any other federal rule, that defendant's statements pursuant to this agreement or any leads derived therefrom, should be suppressed or are inadmissible.

Scruggs challenges the district court's reliance on paragraph 12 on two grounds.

### A.

The first of these, like Scruggs' initial contention, rests entirely on contract law principles. According to Scruggs, as a matter of contract law, the district court could not declare the plea agreement "rescinded" and, at the same time, give the Government the benefit of one of the agreement's provisions. Scruggs maintains that rescission "treat[s] the agreement as if it never existed," and therefore, he argues, he should be treated as if he never waived in paragraph 12 his

ability to contest the admission of statements made pursuant to the plea agreement. Brief of Appellant at 12. Since we find that cancelling an agreement because of a breach, while simultaneously allowing the injured party to retain a remedy for breach under that agreement, is not in any way inconsistent with governing contract law principles, we hold that the district court appropriately enforced paragraph 12.

In arguing to the contrary, Scruggs seeks to take advantage of the "confusion of vocabulary" inherent in the use of the term "rescission." 2 Arthur Linton Corbin, Corbin on Contracts ("Corbin") § 6.10, at 291 (rev. ed. 1995); *see also* 23 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts ("Williston") § 63.31, at 553 (4th ed. 2002). The term "'rescission' is often used by lawyers, courts, and businessmen in many different senses," but its true meaning varies "depending on what caused the contract to end." 7 Corbin § 28.26, at 107-08 (rev. ed. 2002).

To avoid the resultant confusion, both the Uniform Commercial Code and the Restatement now employ different words to distinguish among the various causes of contract termination — all of which have been characterized, at one time or another, as "rescission." *Id.* at 108. "Rescission" now applies only to the abandonment of a contract by "mutual consent." U.C.C. § 2-209 cmt. 3 (1989); Restatement § 283 & cmt. a. In contrast, when, as here, a "party puts an end to the contract" because of the breach of the other party, the contract has ended by "cancellation." U.C.C. § 2-106(4) (1989); Restatement § 283 cmt. a. Upon cancellation, the cancelling party retains not only "any right based on prior breach or performance" but also "any remedy for breach of the whole contract or any unperformed balance." U.C.C. § 2-106(3)-(4).[2]

---

[2]*Sylvania Indus. Corp. v. Lillienfield's Estate*, 132 F.2d 887, 892 (4th Cir. 1963), on which Scruggs heavily relies, also uses the term "rescission," but involves still another type of contract termination, which would probably now be classified as "avoidance" in the U.C.C. and Restatement lexicon. "Avoidance" refers to the ending of a voidable contract on such grounds as incapacity or fraud, as well as "breach of warranty or other promise" that "justifies the aggrieved party putting an end to the contract." Restatement (Second) of Contracts § 7 cmt. b. When a party seeks to avoid a contract, "damages are not owed" and "only rights

In this case, because of Scruggs' breach of the plea agreement, the Government cancelled it; in doing so, the Government retained its "remedy for breach" under the agreement: use of the statements Scruggs had given pursuant to the agreement. That the district court declared the plea agreement "rescinded," not "cancelled," does not transform the cancellation into a rescission. The label used to describe the ending of a contact is "not conclusive"; rather "the context determines the legal effect of bringing the contract to an end." 7 Corbin § 28.26, at 108; *see also 23 Williston* § 63:31, at 553 (noting that "a contract is frequently spoken of as 'rescinded' . . . when in truth, one party to the contract has merely exercised the right to refuse to perform because of the wrongful conduct of the other party").

Here the context is clear: after Scruggs breached the plea agreement, the Government sought to cancel both the benefits Scruggs enjoyed, and its obligations to Scruggs under the agreement. Indeed, paragraph 11 of the plea agreement expressly gave the Government the right to "seek release from . . . any or all its obligations under this plea agreement" in the event Scruggs failed to fulfill the obligations under the agreement.[3] Thus, when, in response to Scruggs' breach, the Government asked that "all provisions benefitting defendant" be voided and that it be granted its "right to be relieved of its responsibilities under the agreement," it was merely exercising its contractual right to cancel rather than seeking to abrogate and undo the contract from the beginning. *See generally* 17A Am. Jur. 2d Contracts § 603 (1991).

In sum, the district court did not err in permitting the Government to cancel the plea agreement, while still retaining its rights under paragraph 12.

---

of restitution are engaged." 7 Corbin § 28.26, at 107. Unlike the Government here, the plaintiff in *Sylvania* did not seek damages for breach and advanced "no allegations appropriate for the recovery of damages on account of breach." 132 F.2d at 890-91. Rather, the plaintiff asked only that the contracts be declared "null and void" and that it receive as "restitution" the money it had paid for the patents at issue in the case. *Id.*

[3]By way of contrast, the contracts in *Sylvania*, 132 F.2d at 890-91, contained no clause equivalent to paragraph 11.

B.

Scruggs' second argument for suppressing his incriminating statements rests on the Government's failure to inform him of his *Miranda* rights before questioning him about the Cornforth murder. He contends that this failure violated his Fifth Amendment privilege against self-incrimination, and renders his statements inadmissible.

"It is well settled that a defendant may waive his right . . . to claim his Fifth Amendment privilege against self- incrimination by negotiating a voluntary plea agreement with the government." *United States v. Wiggins*, 905 F.2d 51, 52 (4th Cir. 1990). Further, a number of courts have recognized that "a plea agreement that states in general terms the defendant's obligation to cooperate with the government can constitute a waiver of the defendant's Fifth Amendment privilege against self-incrimination." *United States v. Bad Wound*, 203 F.3d 1072, 1075 (8th Cir. 2000); *see United States v. Lawrence* 918 F.2d 68, 72 (8th Cir. 1990); *United States v. Resto*, 74 F.3d 22, 27 (2nd Cir. 1996); *see also United States v. Wise*, 603 F.2d 1101, 1104 (4th Cir. 1979) (agreeing with the district court that a witness had "waived his [F]ifth [A]mendment privilege by entering into the plea agreement requiring him to cooperate with the government and by testifying to his participation in the [crime] when he entered his guilty plea").

In this case, it is clear that Scruggs made a knowing and voluntary waiver of his Fifth Amendment rights. In paragraph 12 of the agreement, Scruggs explicitly waived all "claim[s] under the United States Constitution" that his statements made pursuant to the plea agreement should be suppressed or inadmissible in the event he failed to fulfill his obligations. At the time he was questioned about the Cornforth murder, Scruggs should have been "providing all information known to [him] regarding any criminal activity," as required by his plea agreement, and thus his answers were clearly "pursuant to [the] agreement" and so covered by paragraph 12. Hence, the Government had no constitutional obligation to read him the prophylactic *Miranda* warnings before questioning him about the Cornforth murder.[4]

---

[4]During Scruggs' trial, Government witness Travis Friend surprised the Government by contradicting his sworn statement of facts and testify-

## IV.

For all of these reasons, the judgment of the district court is

*AFFIRMED.*

---

ing that he had no knowledge of the events surrounding the Cornforth murder. The prosecutor responded by asking Travis a series of questions about whether he had previously made certain incriminatory statements. On appeal, Scruggs repeats the objection he made at trial to this line of questioning: that it allowed the prosecutor "to relay to the jury all of the testimony he wanted to obtain through Travis Friend by way of leading questions." Brief of Appellant at 28. This argument is meritless. Because Travis had previously sworn to the accuracy of his statement of facts, that statement could be, and was, admitted as substantive evidence under Fed. R. Evid. 801(d)(1)(A). The Government's questioning of Friend during Scruggs' trial merely satisfied the foundation requirements necessary to admit Friend's statement of facts as substantive evidence.