984 P.2d 1253

**BANK OF HAWAII, a Hawai'i banking corporation, Plaintiff–Appellee,**

v.

**Allan Ryo KUNIMOTO, aka Allan R. Kunimoto, Allan R. Kunimoto as trustee of that certain unrecorded Allan R. Kunimoto Revocable Trust Agreement dated February 19, 1981, as amended, Living Designs, Inc., a Hawai'i corporation, Defendants–Appellants,**

and

**John Does 1–10, Doe Partnerships, Corporations or Other Entities, 1–20, Defendants.**

No. 19248.

Intermediate Court of Appeals of Hawai'i.

Sept. 4, 1997.

Reconsideration Denied Aug. 25, 1999.

A. Barry Cappello, James L. Hudgens (Cappello & McCann), California, and Gregg Young (Young & Sen), Honolulu, on the briefs for defendants-appellants.

Tom E. Roesser, Katherine G. Leonard, and William W. Huckins, Honolulu, (Carlsmith Ball Wichman Case & Ichiki), on the brief for plaintiff-appellee.

ACOBA, J., Circuit Judge McKENNA, in place of Judge WATANABE, Recused, and Circuit Judge KOCHI, in place of Judge KIRIMITSU, Recused.

ACOBA, Judge.

We hold in this appeal by Defendant–Appellant Allan Ryo Kunimoto (Defendant), individually, and by Defendant in his capacity as Trustee of a certain unrecorded trust[1] from part of the July 5, 1994 first circuit court (court) deficiency judgment rendered against Defendant in a mortgage foreclosure action filed by Plaintiff–Appellee Bank of Hawaii (the Bank), that following Defendant's default in payment of certain promissory notes, the Bank, as holder of the notes, was required to communicate the exercise of its option to accelerate the maturity date of the notes to Defendant by some affirmative act. Because the court rejected this precept, we vacate part of the July 5, 1994 deficiency judgment and remand the matter for further hearing. To the extent they do not conflict with the foregoing holding, we affirm the court's orders in all other respects.

I.

On April 23, 1993, the Bank filed a mortgage foreclosure complaint against Defendant, individually and as Trustee, and Defendant's corporation, Living Designs, Inc., (collectively Defendants) to recover amounts due on five promissory notes[2] and other

---

1. Defendant–Appellant Allan Ryo Kunimoto (Defendant) is Trustee under the unrecorded Allan R. Kunimoto Revocable Trust Agreement dated February 19, 1981.

2. Other than the First and the Fifth Notes, the promissory notes include: (1) the Second Note, a November 30, 1989 promissory note in the principal amount of $100,000.00; (2) the Third Note, an April 26, 1990 promissory note in the princi-

debt instruments.[3] Only the First and Fifth Notes are relevant to this appeal.

On May 27, 1993, Defendants filed a two-count counterclaim seeking an accounting (1) of the Bank's "application and disposition" of the proceeds from the sale of two parcels of property to cover Defendants' loans and (2) "of the outstanding balance" on all of the loans because "[t]he interest claimed in the Complaint as due and owing, is greater than the amounts billed by the Bank and [Defendants] have never received any notice of any kind whatsoever, prior to the Complaint, that a higher amount of interest is being sought by [the Bank]."

The Bank filed a motion for summary judgment and interlocutory decree of foreclosure against Defendants on November 5, 1993. The motion sought, *inter alia,* a determination that Defendants were in default of their obligations and the "ascertain[ment of] the total amount which is due and owing to [the Bank]...." The motion also requested the court "[t]o reserve jurisdiction[,]" and "if the sale proceeds are insufficient to pay the amounts claimed by [the Bank,] to enter a judgment against [Defendant, individually and as Trustee,] for such deficiency with respect to the First Note and the Fifth Note...."

The court granted the motion for summary judgment and interlocutory decree of foreclosure in its January 18, 1994 findings of fact, conclusions of law, and order. Among other things, the court determined that (1) demand was made upon Defendant, individually and as Trustee, for payment under the notes but Defendant "failed, neglected, and refused to pay," (2) Defendant, individually and as Trustee, had defaulted on the First and Fifth Notes, and (3) the Bank exercised its option to declare the entire amounts of the First and Fifth Notes "presently due and owing." The court, however, did not indicate the dates on which the Bank had exercised its option.

The court concluded that the Bank could foreclose upon Defendants' properties and sell them in the manner prescribed by law. It further concluded that in the event the proceeds of the sale of the properties were "insufficient to pay to [the Bank] all amounts of principal and interest owing [under the five promissory notes], [the Bank] [was] entitled to a deficiency judgment against [Defendant]," individually and/or as Trustee. The court thus retained jurisdiction to determine the amounts owing to the Bank under the notes.

On May 6, 1994, the court entered an order approving the report of the commissioner, confirming the commissioner's sale of the property at public auction, and directing distribution of the proceeds. On April 7, 1994, bidding was reopened on the auction and the highest bid of $940,000 was confirmed.

On May 17, 1994, the court entered an amended order approving the report of the commissioner, confirming the commissioner's sale of the property at public auction, and directing distribution of the proceeds.

On June 1, 1994, the Bank filed a motion seeking deficiency judgments against Defendant, individually and as Trustee, "jointly and severally," in the amount of $720,080.06 on the First and Fifth Notes, and against Defendant in the amount of $979,497.25 on the Second, Third, and Fourth Notes.

On June 6, 1994, Defendants filed an objection to the Bank's motion for deficiency judgments. In their objection, Defendants did "not object to the issuance of deficiency judgments against them provided that the proper amounts are entered." Defendants did, however, take issue with the imposition of a "default" rate of interest of 18% per annum

---

pal amount of $386,738.25; and (3) the Fourth Note, an April 26, 1990 promissory note in the principal amount of $263,261.75.

**3.** Defendant, individually, and/or Defendant in his capacity as Trustee of that certain unrecorded Allan R. Kunimoto Revocable Trust Agreement dated February 19, 1981, was the maker of the notes. Defendant–Appellant Living Designs, Inc.

granted a security interest to Plaintiff–Appellee Bank of Hawaii (the Bank) in all personal property owned by Living Designs, Inc. to secure the obligations of Defendant, individually and/or as Trustee, on the notes. Defendant, individually and as Trustee, and Defendant–Appellant Living Designs, Inc. are collectively referred to herein as Defendants.

under the First and Fifth Notes, contending that the default rate applied only after the maturity dates of the notes, and alternatively, that if the Bank could charge the default rate "prior to maturity but from and after acceleration, [the Bank] did not accelerate payments ... until the filing of the Complaint on April 23, 1993."

In its June 8, 1994 reply to Defendants' objection, the Bank argued that under the plain language of the First and Fifth Notes, the Bank could accelerate the maturity dates of the loan after default by Defendants, without notice. Upon acceleration, the Bank contended it was entitled to charge interest at the default rate. The Bank represented that it "exercised its option and accelerated the obligations under both [the First and Fifth Notes.]"

The affidavit of Patrick E. Green (Green), a vice-president of the Bank, was submitted in support of the reply. Green's affidavit disclosed that Defendant, individually and as Trustee, defaulted on the First and Fifth Notes in June 1991[4] and that on July 10, 1991, the Bank "exercised its option to accelerate the indebtedness under said Notes." According to Green, "[i]nterest ha[d] accrued on the principal balances of the First and the Fifth Notes from and after July 10, 1991 at the default rate of eighteen percent (18%) per annum." Green admitted that the Bank's Business Loan Service Center (BLSC) mailed monthly "loan payment notices" to Defendants indicating interest on the First and Fifth Notes was charged at the contract rates rather than at the default rate "solely because [the Bank's] exercise of the option to accelerate those notes had not been properly communicated to BLSC."

At the June 9, 1994 hearing on the motion, Defendants declared that their "only real objection" was the "application of the default interest [rate]." The Bank took the position that it "was not required to give notice to [Defendants] of the acceleration." In opposition, Defendants maintained that the Bank was required to do "something affirmative to

exercise its option" rather than relying on "a secret mental process of acceleration."

The court, however, stated that it was "standard practice" to accelerate, explained that "acceleration causes the maturity" and resulting liability at the default rate, and granted the Bank's request for deficiency judgment in the amounts prayed for.

On July 5, 1994, the court entered its order granting the Bank's motion for deficiency judgments. On the same day, deficiency judgments were entered against Defendant, individually and as Trustee, "jointly and severally," in the amount of $720,080.06 on the First and Fifth Notes, and against Defendant individually, in the amount of $979,497.25 on the other notes.

On February 13, 1995, the Bank filed a motion pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rules 7(b), 8(c), 54(b), and 60(b)(6). The Bank requested that the court "amend or clarify" its July 5, 1994 order "to address Defendants['] so-called 'counterclaims [sic].' " Arguing that Defendants' counterclaim for an " 'accounting' actually constituted misnamed defenses to the Bank's claims," the Bank contended that when the court issued its July 5, 1994 order, it had decided the issues raised in the counterclaim. Hence, the Bank sought an amendment or clarification of the July 5, 1994 order to confirm that the court had "rejected the defenses raised by Defendants in their so-called counterclaim and that there [we]re no remaining issues in th[e] case." Alternatively, the Bank asked the court to certify the deficiency judgments as final pursuant to HRCP Rule 54(b).

A hearing on the Bank's motion was set for March 2, 1995. At the March 2, 1995 hearing, the court, at Defendants' request, continued the matter to March 30, 1995. The Bank and Defendant thereafter stipulated to two further continuances, first to May 4, 1995 and then to May 25, 1995.

---

4. Prior to Patrick E. Green's affidavit, the Bank had alleged in its April 23, 1993 complaint that Defendant, individually and as Trustee, failed to make payments on the First and Fifth Notes from August 18 and August 11, 1990, respectively. In

its November 5, 1993 memorandum in support of its motion for summary judgment, however, the Bank represented that Defendant, individually and as Trustee, had failed to make payments on the First and Fifth Notes from May 23, 1991.

At the May 25, 1995 hearing, an attorney appeared on behalf of Defendants as their "local" counsel. Defendants' local counsel informed the court that Defendants had retained out-of-state counsel. In this regard, a *pro hac vice* motion had been scheduled for hearing on June 7, 1995. Local counsel, who apparently had been only recently retained by Defendants, represented to the court that it was his "understanding" that he would be handling only the "non-dispositive," "procedural type" of motions since he had "no background in lender liability law" and was "completely unprepared."

In response, the court stated that there was "no reason to delay it because you [sic] have new counsel because it's a matter of clarification or to amend the order or to grant certification." The court then ruled that the issues raised in Defendant's counterclaim "ha[d] been decided," the court's prior ruling would be clarified to "reflect[ ] a dismissal of the counterclaim," and HRCP Rule 54(b) certification would be granted.

On June 23, 1995, the court filed its order granting the Bank's motion. The June 23, 1995 order amended the court's July 5, 1994 order to reflect the dismissal of Defendants' counterclaim and certification of the court's July 5, 1994 deficiency judgments as final.

Defendants filed a motion for reconsideration on July 3, 1995, which the court denied on August 9, 1995.

Defendants appealed.

## II.

Defendants first contend that the court erred in awarding the Bank over $213,000.00 in interest at the default rate as part of the deficiency judgment of $720,080.06 on the First and Fifth Notes.[5].

Pointing out that the Bank did not take any affirmative action informing them that the loan amounts under the First and Fifth Notes were being accelerated, they assert that the Bank could not "retroactively charge the default rate" from the filing of the complaint back to the purported acceleration date of July 10, 1991. Defendants also rely on "uncontested evidence" of the Bank's loan payment notices received by Defendant between November 1992 and April 1993.[6] These notices reflected that the interest rate being charged on the First and Fifth Notes during that period were the contract rates of 10.25% and 7.75%,[7] respectively, and not the 18% default rate.

As noted *supra*, the Bank maintains that it "exercised its option to accelerate" the loan balances under the First and Fifth Notes on July 10, 1991 after Defendants defaulted in June 1991 and that after July 10, 1991, interest had accrued on the balances at the 18% rate. On appeal, the Bank argues that under the plain language of the Notes, it was not required to provide Defendants with notice of acceleration.

## A.

We begin our analysis by construing the Notes before us to divine the intent of the

---

**5.** In their Opening Brief, Defendants do not explicitly state which deficiency judgment amount they are challenging. They do, however, refer to "$213,000 of default interest[.]" As explained in the Bank's Answering Brief, the total interest for the First and Fifth Notes was $213,029.05. Furthermore, in Defendants' June 6, 1994 memorandum in support of their objection to the Bank's motion for deficiency judgment, Defendants objected to the $720,080.06 prayed for by the Bank on the First and Fifth Notes and requested that that amount "must be reduced by at least over $213,000.00." Defendants also "d[id] not object to the deficiency amounts that [the Bank sought] for [the Second, Third, and Fourth Notes]."

Thus, we understand Defendants to challenge only the court's deficiency judgment award of $720,080.06 on the First and Fifth Notes.

**6.** Defendants appear to argue that the Bank's "representations" in these notices were "binding" upon the Bank with respect to the applicable rate of interest to be charged. In the alternative, Defendants maintain that the Bank waived any right to claim interest charges other than those stated in the notices. In light of our holding, *infra*, we need not reach the merits of these arguments.

**7.** Unlike the First Note, the Fifth Note indicated that interest would accrue "at the initial rate of 10.50% per annum on the unpaid balance of principal remaining from time to time unpaid, which rate shall change so that at all times the rate of interest shall be one and three-quarters percentage points (1.75%) above the Base Rate of interest charged from time to time by BANK OF HAWAII." The notices sent to Defendant from November 1992 through April 1993 reflect an interest rate of 7.75% for the Fifth Note.

parties as expressed in the instruments. *Brown v. KFC Nat'l Management Co.*, 82 Hawai'i 226, 240, 921 P.2d 146, 160, *recon. denied*, 82 Hawai'i 360, 922 P.2d 973 (1996).

Both the First and Fifth Notes include the following pertinent language:

> *If the Maker shall default in the payment of any amount of interest or principal payable under this Note, and if such payment is not made within 10 days after the due date of such payment, or upon the occurrence of any other Event of Default . . ., the entire principal amount outstanding hereunder and accrued interest thereon shall at once become due and payable, without notice, at the option of the Holder. The entire principal amount from and after maturity, whether or not resulting from acceleration, shall bear interest at the rate of interest of eighteen percent (18%) per annum . . . .*
>
> . . . .
>
> The failure of the Holder to exercise any option herein granted to the Holder upon the default of the Maker shall not constitute a waiver of the right to exercise such option in the event of any subsequent default.

(Emphases added.)

We note initially that the First and Fifth Notes were both made on December 4, 1987. The First Note was in the principal amount of $900,000 at a contract rate of interest of 10.25%. Under its terms the First Note was to mature on December 8, 1996, after the April 23, 1993 date on which the Bank filed its suit.

The Fifth Note was in the principal amount of $190,000 at a contract rate of 7.75%. The Fifth Note matured on February 1, 1993, before the April 23, 1993 filing date of the Bank's suit. Thus, under the terms of the Fifth Note and as Defendants impliedly concede, the 18% interest rate on the Fifth Note would take effect on February 1, 1993 whether the Bank exercised its option to accelerate the Fifth Note or not.

We are thus concerned in this appeal with the proper interest rate which was chargeable to the First Note before the date of the Bank's complaint and the proper interest rate chargeable to the Fifth Note before February 1, 1993.

■ The provision in the First and Fifth Notes quoted above is an "optional" as opposed to an "automatic" acceleration clause. Under an automatic acceleration clause, "the entire principal becomes automatically due without the necessity of a declaration of the right or an election on the part of the holder [of the note]." Annotation, *What is Essential to Exercise of Option to Accelerate Maturity of Bill or Note*, 5 A.L.R.2d 968 [hereinafter Annot. *Exercise of Option to Accelerate*, 5 A.L.R.2d], § 1, at 969 (1949). In contrast, under an optional acceleration clause, the holder is given a choice of whether or not to accelerate the maturity date of the note. Therefore, as a general rule, a party exercising its option to accelerate must communicate its election to accelerate:

> [A] provision in a bill or note accelerating the maturity thereof on nonpayment of interest or instalments, or other default, at the option of the holder, requires some affirmative action on the part of the holder, evidencing his [or her] election to take advantage of the accelerating provision, and . . . until such action has been taken the provision has no operation. *In other words, some positive action on the part of the holder is an essential condition for the exercise of his [or her] option and a mere mental intention to declare the full amount due is not sufficient.*

*Id.* at 970 (emphasis added).

### B.

■ "It is fundamental that terms of a contract should be interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning." *Brown*, 82 Hawai'i at 240, 921 P.2d at 160 (citation, brackets, and internal quotation marks omitted). Under the plain language of the Notes, Defendant had ten days after missing a payment of interest or principal to cure the default. If after the ten days Defendant failed to cure the default, the Bank had the option, without

first notifying Defendant, of accelerating the Notes. Thus, the meaning of the provision "without notice" is crucial to the construction of the language of the Notes.

The Bank would have us construe the provision "without notice" as meaning that the Bank never had to give Defendant notice that it had accelerated the loan. In our view, this construction is simply inconsistent with the language of the Notes taken as a whole.

An option is defined as the "power or right to choose." *Merriam Webster's Collegiate Dictionary* 817 (10th ed. 1993); *see also Black's Law Dictionary* 1094 (6th ed. 1990) (defining option as a "[r]ight of election to exercise a privilege"). Accordingly, when Defendant defaulted, the Bank could have chosen not to accelerate the loan.[8] The Notes contemplate this alternative by providing that if the Bank failed to exercise the option on the first default, it did not waive its ability to accelerate the loan upon later defaults.[9]

■ Hence, we believe that the provision "without notice" refers to the fact that the Bank was not required to provide Defendant with notice of its *intent* to exercise its option prior to doing so and not to the actual exercise of its option. This construction is further supported by case law.

## C.

In *Carmichael v. Rice*, 49 N.M. 114, 158 P.2d 290, 292 (1945), the plaintiff brought suit for $4,500 as the unpaid balance claimed to be due under the terms of a certain promissory note. The issue was "the legal effect of an acceleration clause" in the promissory note. *Id.* The relevant language of the promissory note was as follows:

> If any installment of this note, either principal or interest, is not paid at the time and place specified herein, and shall remain unpaid for thirty days or longer, *the entire amount unpaid on this note shall,*

*at the option of the holder of this note and without demand or notice, be due and payable forthwith.*

*Id.* In analyzing the promissory note, the New Mexico Supreme Court indicated that the option to accelerate was not automatic, but required some affirmative act:

> An intention to make the note optional with the holder, that is to require that [he or] she must by some affirmative act accelerate the payments, might have been more clearly expressed; yet we agree with the trial court that this right was an optional one and the payments did not become automatically accelerated, without some affirmative act on [his or] her part.

*Id.* The court construed the phrase "at the option of the holder of this note and without demand or notice, be due and payable" as referring to the holder's "intent" to accelerate:

> We will give the clause that construction which makes sense, avoiding that which makes none. And that is to say that *under the clause in question there must be some exercise of the option, some affirmative act showing an intent to elect to accelerate; and that the additional clause "without demand or notice" means, simply, that the holder may exercise such option without giving to the maker any notice of such intention* and without demand for the payment of the unpaid balance which would thus be accelerated.

> As [defendant] argues, this of course does not mean that the holder can exercise the option by some secret mental process on [his or] her part not evidenced by some form of affirmative action, such as by bringing suit thereon, or say, by entering the entire unpaid balance as immediately due and payable upon [his or] her books of account. It is imperative that some act, signifying an intention to accelerate must appear[.]

8. It has been held that a holder of a note might prefer to retain the note as a contract maturing in installments, with the privilege of suing on each installment rather than converting it into a single demand. *Sheffield v. Johnson County Savings Bank*, 2 Ga.App. 221, 58 S.E. 386 (1907).

9. Of course, if a holder notifies the maker that a note is accelerated, a maker would at that point have the opportunity, if it could, to pay the amount owed or to refinance the amount owed at a lower interest rate to avoid paying an increased interest rate following acceleration.

*Id.* (emphases added); *see also Fletcher v. Public Fin. Co. of Alabama,* 429 So.2d 1039, 1040 (Ala.Civ.App.1981) (holding that the words "without notice or demand" in an optional acceleration clause "do not negate the requirement that the holder affirmatively elect to accelerate the debt" because "[t]he option is not self-executing.... It is mandatory that some definitive action be made on the part of the lender[.]" (citation omitted)), *rev'd on other grounds, Ex Parte Fletcher,* 429 So.2d 1041 (Ala.1982); *Trigg v. Arnott,* 22 Cal.App.2d 455, 71 P.2d 330, 332 (1937); *Kamaole Resort Twenty–One v. Ficke Hawaiian Invs.,* 60 Haw. 413, 418, 591 P.2d 104, 108 (1979) (concluding that where there was "no finding" or "any suggestion in the record" indicating that a mortgagee had exercised its acceleration option after the mortgagor defaulted on his or her interest payments, it was error for the trial court to compute interest at the 15% default rate for any period prior to the date the principal matured under the promissory note at issue); *United Benefit Life Ins. Co. v. Holman,* 177 Neb. 682, 130 N.W.2d 593, 595 (1964) (holding that where acceleration of the maturity of a mortgage debt on default is made optional with the mortgagee, the mortgagee must take "some affirmative action" evidencing its election to take advantage of the accelerating provision and "until such action has been taken, the provision has no operation."); *Florance v. Friedlander,* 209 Va. 520, 165 S.E.2d 388, 391 (1969); *but cf. Chapa v. Herbster,* 653 S.W.2d 594, 601 (Tex.Ct.App.1983) (construing the words "without presentment or demand or any notice to the Maker" in an optional acceleration clause as not requiring notice to Maker that the option had been exercised).

In addition, we find the facts of *In re Holiday Mart, Inc.,* 9 B.R. 99 (Bkrtcy. D.Haw.1981), which had been argued by Defendants to the court, to be remarkably similar to the instant case. In *Holiday Mart,* the plaintiff claimed that the promissory note had been accelerated when the plaintiff's predecessor in interest sent a certified letter to notify the debtor that the promissory note was accelerated. The certified letter went unclaimed by the debtor despite several notices from the postal service and no evidence

was submitted to the court that the notice ever reached the debtor by any other means. The certified letter contained a "definite statement that the option to accelerate [was] being exercised, that the entire indebtedness [was] immediately due at the higher interest rate, and that the [m]ortgagee [would] seek legal remedies if full payment [was] not made within ten days." *Id.* at 103.

Like Defendants in our case, the debtor continued to receive monthly loan billing statements from the plaintiff reflecting the contract rate rather than the default rate of interest. The debtor contended that acceleration did not occur because "notwithstanding the terms of the [promissory note], acceleration required an affirmative action by [plaintiff]; and the only such act by [plaintiff] was the certified letter which was sent but not received[.]" *Id.*

Also, like the First and Fifth Notes in the instant case, the promissory note contained a waiver clause and provided that upon default, the interest on the outstanding principal would increase, and the balance could be accelerated without notice at the option of the holder:

> While any default exists in the making of any of said payments or in the performance or observance of any of the covenants or agreements of this Note or of any instrument now or hereafter evidencing or securing the indebtedness *may become due and payable at once at the option of the holder hereof and without notice,* and thereafter the unpaid principal shall bear interest at the rate of TWELVE PERCENT (12%) per annum. Failure to exercise this option by the holder hereof howsoever often shall not constitute a waiver of the right to exercise it thereafter.

*Id.* at 102 (emphasis added).

While we express no opinion with respect to the effect given by the bankruptcy court to the debtor's failure to respond to the postal service notices, we do concur with the general proposition that a holder must clearly inform the maker that the option to accelerate had been exercised:

> It is well established that to exercise an option to accelerate the maturity of a note

the holder must take some affirmative action that evidences its intention to accelerate. *The exercise of the option to accelerate must be in a manner that is clear and unequivocal and effectively informs the maker that the option to accelerate has been exercised.* This requirement applies even where the note provides for acceleration "without notice."

*Id.* at 105 (citations omitted) (emphasis added); *see also Moresi v. Far West Servs., Inc.,* 291 F.Supp. 586, 588 (D.Haw.1968).

We hold, then, that the clause "without notice" permits the Bank to forego informing Defendants of its *intent* to accelerate the maturity date of the Notes prior to doing so. However, in order for the Bank to effectively exercise its option to accelerate the maturity dates of the Notes, the Bank was required to communicate its exercise of the option to Defendants by some affirmative act when it did so.

## III.

■ In general, "the rule is that the exercise of the option [to accelerate] must be made in a manner so clear and unequivocal as to leave no doubt as to the holder's intention and to apprise the maker effectively of the fact that the option has been exercised." Annot. *Exercise of Option to Accelerate,* 5 A.L.R.2d § 4, at 972.

The record contains Green's statement that the Bank exercised its option on July 10, 1991. The Bank admits, however, that its own notices reflect that as late as April 1993, the contract rates rather than the 18% interest rate were applied on the balances due under the First and Fifth Notes.

■ We recognize that the holder's initiation of a suit for the whole debt constitutes a sufficient affirmative act to communicate to the maker that he or she has chosen to exercise his or her option to accelerate. Annot. *Exercise of Option to Accelerate,* 5 A.L.R.2d § 5, at 975 ("The institution of a suit for the whole debt is ... the most solemn form in which the holder can exercise his [or her] option."); *cf. Bank of Honolulu, N.A. v. Anderson,* 3 Haw.App. 545, 553, 554, 654 P.2d 1370, 1376 (1982) (upholding trial court's treatment of a bank's action to cancel an agreement of sale for property due to nonpayment as an acceleration of all amounts due and owing under the agreement).[10]

Defendants concede that the Bank's exercise of its option to accelerate was properly communicated as of the date of the Bank's complaint on April 23, 1993 and we so hold. The question remains, however, as to whether the Bank otherwise effectively communicated the exercise of its option to accelerate prior to April 23, 1993 with respect to the First Note and prior to February 1, 1993 with respect to the Fifth Note.

In light of the rule we adopt in this case, we vacate the July 5, 1994 deficiency judgment award in the amount of $720,080.06, which included $213,029.05 as interest calculated from July 10, 1991 at the default rate on the First and Fifth Notes. We remand this case (1) for a further hearing to adduce evidence of whether the Bank otherwise exercised its option to accelerate the First and Fifth Notes prior to April 23, 1993 and February 1, 1993, respectively, and (2) for the court's resulting determination of the correct amount of interest owed by Defendants, and the entry of an appropriate deficiency judgment.[11]

**10.** Without necessarily concurring with the following decisions, in light of our preference for clear and effective communication of the exercise of an option to accelerate, we note that courts have deemed a variety of actions by the holder of a note as sufficient affirmative acts notifying the maker that the holder has chosen to exercise the option to accelerate. *See Sharpe v. Brotzman,* 145 Cal.App.2d 354, 302 P.2d 668 (1956) (demand for payment of all unpaid balance attached to formal notice of foreclosure sale under chattel mortgage); *Santini v. Fritkin,* 240 Md. 542, 214 A.2d 578 (1965) (foreclosure of chattel deed of trust securing promissory note

and subsequent application of net proceeds of sale to promissory note); *Markle v. Columbia Union Nat'l Bank & Trust Co.,* 483 S.W.2d 682 (Mo.App.1972) (repossession of the car covered by a note); *United Benefit Life Ins. Co. v. Holman,* 177 Neb. 682, 130 N.W.2d 593, 595 (1964) (sending letter stating, "[W]e are exercising our right to hereby declare the entire loan due and payable.").

**11.** In light of our holding vacating the July 5, 1994 deficiency judgment as to the First and Fifth Notes, Defendants' contention that the

## IV.

Defendants also contend that the court abused its discretion and denied them due process when it refused to continue the May 25, 1995 hearing on the Bank's February 13, 1995 motion to clarify or amend the order granting deficiency judgment and/or to certify the deficiency judgments.

■ The denial of a continuance is a matter that is addressed to the sound discretion of the trial court and is not subject to reversal on appeal absent a showing of abuse. *Kam Fui Trust v. Brandhorst*, 77 Hawai'i 320, 324, 884 P.2d 383, 387, *as modified on recon.* (App.1994).

Defendants, although represented at the May 25, 1995 hearing by local counsel, maintain that they were "effectively without counsel" at the hearing and sought a continuance until their out-of-state expert counsel could present Defendants' "opposing arguments and proposed new counterclaims." [12]

### A.

■ At the May 25, 1995 hearing, after local counsel informed the court of Defendants' *pro hac vice* application for out-of-state expert counsel and that expert counsel "wanted to handle this motion," the court indicated it would "rule at this time." Referring to the nature of the Bank's motion, the court decided that "there[ ][was] no reason to delay" because Defendants' "ha[d] new counsel."

The court proceeded to clarify its order, stating that when it "took under advisement and ruled on the deficiencies, the [c]ourt ruled on everything." The court indicated

that it "took into consideration the alleged counterclaim, which is really an accounting . . . ."

The record reflects that Defendants were represented by counsel at the time of the filing of the Bank's February 13, 1995 motion and at the May 25, 1995 hearing on the motion. Significantly, the hearing, originally scheduled for March 2, 1995, had been continued once by the court at Defendants' request and twice thereafter by stipulations signed personally by Defendant. Hence, Defendants had over three months between the Bank's February 13, 1995 motion and the May 25, 1995 hearing on the motion to secure counsel who would be prepared to argue against the Bank's motion at the hearing.[13] Under the circumstances, it cannot be said the court abused its discretion.

### B.

■ With respect to Defendants' argument that a continuance would have allowed them to amend their counterclaim by adding "meritorious lender liability claims" against the Bank, we note that Defendants never sought to amend their May 27, 1993 counterclaim to include such claims before the May 25, 1995 hearing, nearly two years later. It was within the court's discretion to determine that an attempt by Defendants to amend their counterclaim at this stage of the proceeding was untimely and to deny a continuance for that purpose.

### V.

Defendants lastly contend that in its August 9, 1995 order, the court erred in denying Defendants' July 3, 1995 motion for reconsid-

---

court's June 9, 1994 reference to "standard practices" was erroneous is moot.

12. On appeal, Defendants claim that they would have raised the following arguments which "would have defeated" the Bank's February 13, 1995 motion: (1) that Defendants had meritorious counterclaims that could have been asserted; (2) the Bank's motion under Hawai'i Rules of Civil Procedure (HRCP) Rule 60(b) should have been denied because it was legally deficient; (3) that the motion should have been denied because it deprived Defendants of due process; and (4) the HRCP Rule 54(b) motion was improperly granted.

13. The Bank's attorney, in a July 25, 1995 affidavit, avers that in addition to sending Defendant file-stamped copies of the stipulations to continue, she sent him two letters on April 28, 1995 and May 15, 1995 "setting forth" and "reminding" Defendant of the May 25, 1995 hearing date. She also maintains that one of Defendant's California attorneys contacted her about the hearing on May 16, 1995. The Bank's attorney stated that she informed him both orally and in writing that the Bank would not agree to a further continuance on the motion.

eration of the court's June 23, 1995 order granting dismissal of Defendants' counterclaim and certification of the deficiency judgments. Defendants maintain that they were denied due process, that additional counterclaims existed, and that given the existence of these counterclaims, the court's HRCP Rule 54(b) ruling was improper.[14]

On appeal, the trial court's denial of a motion for reconsideration is reviewed under the abuse of discretion standard. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114–15, 839 P.2d 10, 26 (1992). "The purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been made during the earlier adjudicated motion." *Id.*

Defendants fail to adduce evidence that such matters could not have been raised during the earlier hearing on May 25, 1995. Hence, we cannot conclude that the trial court was wrong in denying Defendants' reconsideration motion.

Moreover, in light of our holding, *supra*, that the court did not abuse its discretion in refusing to continue the May 25, 1995 hearing, Defendants' argument with respect to due process and additional counterclaims is not persuasive.

## VI.

Accordingly, we vacate (1) the July 5, 1994 deficiency judgment award of $720,080.06 and (2) the June 23, 1995 order granting the Bank's motion to clarify the deficiency judgment to the extent that the June 23 order confirms the award of $720,080.06. We remand the $720,080.06 deficiency judgment award to the court for further hearing and for determination of the correct amount of interest owed by Defendants. We affirm the July 5, 1994 deficiency judgment and the June 23, 1995 order in all other respects and we affirm the August 9, 1995 order denying Defendants' motion for reconsideration.

14. Defendants attached a copy of the proposed counterclaim as an exhibit to their July 3, 1995 motion for reconsideration.