185 P.3d 902

**David BISCHOFF, Plaintiff–Appellant,**

v.

**Kimi COOK formerly known as Kimi Cook–McKie, Defendant–Appellee.**

**No. 26660.**

Intermediate Court of Appeals of Hawai'i.

March 31, 2008.

David W. Lacy and Kimberly A. Jackson, on the briefs, Kailua Kona, for Plaintiff–Appellant.

Francis L. Jung and Usha Kilpatrick Kotner (Jung & Vassar), on the briefs, Kailua Kona, for Defendant–Appellee.

RECKTENWALD, C.J., WATANABE and FUJISE, JJ.

Opinion of the Court by FUJISE, J.

Plaintiff–Appellant David Bischoff (Bischoff) appeals from the final judgment entered June 1, 2004, in the Circuit Court of the Third Circuit (circuit court).[1] Final judgment was entered pursuant to the March 29, 2004 Findings of Fact, Conclusions of Law and Order (Order) entered in favor of Defendant–Appellee Kimi Cook, formerly known as Kimi Cook–McKie (Cook), following a bench trial.

## I. BACKGROUND

Bischoff, a realtor since 1974, has lived in Hawai'i since 1987 and on the Big Island since 1997. In 1992, Bischoff formed Realty Executives Hawaii (REH), a regional franchise brokerage for Realty Executives International (REI) with a regional territory covering the entire State of Hawai'i. In addition to selling REI franchises, Bischoff has operated REH as a real estate brokerage and sales company with agents. In 1997, Cook began working for Bischoff at REH as a real estate agent.

On November 1, 1999, Cook drafted and entered into a written agreement and promissory note (Agreement) with Bischoff "for

---

1. The Honorable Ronald Ibarra presided.

a[REI] Franchise for the Island of Hawaii," for the sum of $80,000.00, to be paid over a 29–month period, beginning in November 1999 and ending in March 2002, subject to Cook "qualifying to purchase the Franchise, under the terms and conditions of the Franchise."[2] The Agreement was modified on November 28, 1999 to revise the payment schedule and further detail certain items Bischoff was to transfer to Cook, including the office phone numbers (Numbers), as well as certain specified office equipment.[3] Monthly payments were due on the first of each month, beginning on April 1, 2000, and were to continue until the balance was paid.

According to the terms of the Agreement, the sales price of $80,000.00 represented the composite of $37,000.00 for a release of the Big Island from REH's regional territory and $43,000.00 for the existing brokerage assets, which included, in addition to those items mentioned above, all sixteen agents then employed by REH.[4] The Agreement also contained a sentence stating that "[Bischoff] agrees not to compete." The parties contemplated the no-compete clause to mean Bischoff would not open offices within Cook's territory or hire agents in competition with her. The Agreement also contained an optional acceleration clause stating:

> In the event of default in the payments of any installment under this note/agreement and if default is not made good within thirty days, the entire principal shall become due and payable at the option of the Seller, holder of this note. Failure to ex-

ercise this option shall not constitute a Waiver of the right to exercise the same in the event of any subsequent default.

Cook assumed operation of a REI franchise, which was called Realty Executives Big Island Corporation (REBIC). Initially, Cook operated REBIC out of the same office in which Bischoff was operating REH on Walua Road in Kailua–Kona. However, in February or March of 2000, Cook moved REBIC from Walua Road to the King Kamehameha Mall, also in Kailua–Kona. As part of moving the franchise, Cook transferred the franchise Numbers to King Kamehameha Mall with Bischoff's assistance.

Cook was not successful with REBIC and in August 2001, attempted to sell REBIC to Downey Silva in exchange for "taking over the company and assuming the lease and things like that." A "couple of weeks" before the end of August 2001, Cook also had discussions with Bischoff to the effect that she was thinking of closing down her office and asked him if he wanted "to take it back." Between August 31, 2001 and September 8, 2001, sale negotiations with Downey Silva broke down, and the sale did not go through. Also during this period, Cook discussed, but was unable to reach an agreement with Bischoff to transfer operation of REBIC to Bischoff in exchange for forgiveness of the outstanding debt on the franchise sale.

By June 12, 2001, when her last payment was made, Cook appears to have paid a total of $44,500.00 of the $80,000.00 she owed Bis-

---

**2.** Plaintiff–Appellant David Bischoff (Bischoff) testified that only Realty Executives International (REI) had the right to convey franchises and that he did not sell franchises but only brokered them. However, presumably because at the time of the Agreement, Bischoff held the REI franchise for the State of Hawai'i, for REI to grant a franchise to Defendant–Appellee Kimi Cook, formerly known as Kimi Cook–McKie (Cook) for the island of Hawai'i, Bischoff needed to sign a release of that territory to REI before REI entered into a franchise agreement with Cook.

Bischoff also testified that if a franchisee in his territory lost their franchise, it would be up to him, as regional director, to either take the territory back or arrange another sale.

**3.** The November 28, 1999 written agreement Cook entered into with Bischoff also "Included in the Sale,"

3. Any Signs, forms, Folders Stationary [sic], Real Estate Books, etc.
4. Office Built with my approval
5. Terms and length of lease: my approval
6. [Bischoff] available as a consultant/advisor

On December 10, 1999, Bischoff and Cook entered into a "Territory Release Agreement" wherein Bischoff released back to REI the territory of the island of Hawai'i so that REI could resell the territory to Cook. On January 14, 2000, REI, through its President, Richard A. Rector, signed the Franchise Agreement # 2652 granting a license to Cook for the territory of the island of Hawai'i.

**4.** While not specified in the Agreement, consistent with the practice under Bischoff, these agents paid to Cook either a "desk fee" of $240–750 per month plus a per-transaction fee, or split their sales commissions with Cook.

choff under the sales agreement, leaving a $35,500.00 balance.[5] At some time following her last payment but before September 10, 2001, Cook, through her soon-to-be-husband, Mr. Walls (Walls), indicated to Bischoff that Cook no longer owed Bischoff any money. Before this, Cook had never disputed the amount of money she owed Bischoff.

After failing in her attempts to sell the business, Cook issued termination letters to REBIC's remaining agents on September 8, 2001. On September 10, 2001, after attempting to transfer the Numbers to her home the previous day, the phone company told Cook that the Numbers were in Bischoff's name and that all calls to the phone Number would be forwarded to Bischoff's "personal" phone number. She then attempted to contact Bischoff by phone to have the Numbers transferred, but was unable to reach him. Finally, that same day, she sent a letter to Bischoff relating what the phone company told her, accusing him of "operating [REH] on the Island of Hawaii for some time and . . . also representing [REBIC] as [Bischoff's] own office headquarters for [Bischoff's] property management company." Cook made no further attempts to contact Bischoff.

Despite the dispute over the Numbers, Cook acknowledged that she had control over the phone and fax lines while she ran REBIC and Bischoff's failure to transfer ownership of the Numbers to her did not contribute to the decisions she made with respect to REBIC, including her loss or discharge of REBIC's agents. Cook did not blame Bischoff for the failure of REBIC.

Bischoff did not dissolve REH after entering into the November 1, 1999 written agreement with Cook, but continued to operate his property management business under that name. Bischoff did not sell property again until after September 10, 2001, when Cook closed down REBIC. Bischoff explained that he began selling property through REH after September 10, 2001, because the obligation to maintain a minimum number of agents, which Cook had failed to do, reverted back to Bischoff. Some of the agents re-

leased by Cook also contacted Bischoff and asked him to take them on. There is no evidence that Cook made any sales of real estate after September 10, 2001.

On March 20, 2002, Bischoff filed a complaint in the circuit court alleging that Cook had breached their agreement by failing to pay the remaining balance of $44,100.00 on the promissory note dated November 28, 1999. Bischoff's prayer for relief consisted of the amount due on the note plus interest and attorney's fees and costs.

Cook answered Bischoff's complaint and also brought two counterclaims alleging breach of contract and breach of the implied covenant of good faith and fair dealing. Cook sought special, general, consequential and punitive damages, and attorney's fees and costs.

The suit proceeded to a jury-waived trial which began on December 16, 2003. Following the bench trial, the circuit court entered its Order on March 29, 2004. Without reaching any conclusions regarding the existence of a breach of the Agreement, the circuit court concluded that Bischoff had elected rescission as his remedy and that he was under an obligation to return Cook to the position she was in prior to entering the contract.

Despite making findings of fact and conclusions of law appearing to render Bischoff the prevailing party on the merits, to the extent that the circuit court concluded he had elected rescission as his remedy, the circuit court entered judgment on June 1, 2004, resolving Bischoff's claim in favor of Cook and dismissing Cook's counterclaims in their entirety. Cook was awarded $48,000.00 in restitution, $12,000.00 in attorney's fees and $1,171.00 in costs.

As authorized by Hawaii Revised Statutes (HRS) § 641–1(a) (1993), Bischoff timely filed a notice of appeal from the final judgment on June 29, 2004. *See* Hawai‘i Rules of Appellate Procedure 4(a)(1) and 4(a)(3).

---

5. At trial, Bischoff introduced Exhibit 2, which Cook acknowledged she had prepared and which reflected this balance. According to this exhibit, the last payment Cook made was on June 12, 2001. Bischoff testified that in July 2001, he demanded that Cook make the unmade payments reflected in Exhibit 2.

## II. POINTS OF ERROR

Bischoff raises six points of error. In his first point, Bischoff contends that the circuit court erred when it found that Bischoff had rescinded the contract with Cook. Bischoff argues that one who sustains loss by breach of contract is entitled to have just compensation commensurate with the loss, provided damages are established with reasonable certainty. As such, because Cook's breach of contract initiated the series of events leading to the instant litigation, Bischoff argues he should have been awarded appropriate damages.

Instead of electing rescission, as the circuit court concluded he had, Bischoff believes his conduct comported with his obligation to mitigate damages. Bischoff contends that an obligation to mitigate arose when Cook abandoned her rights and property under the contract, manifesting an intent not to reclaim them. Moreover, Bischoff contends, a party is not generally required to elect between inconsistent remedies prior to the conclusion of trial, and in fact, is only able to make such an election by unequivocally and knowledgeably proceeding on one of the remedies. Bischoff believes that at no point did he make an unequivocal and knowledgeable election to rescind.

In his second point of error, Bischoff argues in the alternative, that even if he had elected to rescind the contract, such election was not a complete bar to recovering damages and the circuit court erred when it concluded otherwise.

Bischoff's next two points of error relate to the restitution award. In his third point, Bischoff challenges the circuit court's conclusion that he failed to present any evidence regarding the value of the business at the time of rescission. In his fourth point, Bischoff argues that the circuit court erred in ruling that he must return all of the money Cook paid him on the agreement, including the franchise fees and monies paid for the franchise, equipment and realtors. In raising these points, Bischoff argues generally that the restitution imposed by the circuit court failed to return the parties to the *status quo ante*.

In the fifth point of error, Bischoff contends that the circuit court erred by failing to conclude that Cook had breached the contract. Finally, in the sixth point of error, Bischoff contends that the circuit court erred in awarding Cook attorney's fees since Bischoff did not elect rescission, and even if he did elect rescission, he should have been deemed the prevailing party.

Because the undisputed evidence presented to the circuit court established a breach of contract by Cook and no agreement by the parties to abandon the contract, the circuit court's conclusion that Bischoff elected the remedy of rescission is not supported by the evidence or the law governing rescission. As such, we vacate the Order and judgment entered in this case and remand for further proceedings. We do not reach Bischoff's other point on appeal.

## III. STANDARDS OF REVIEW

■■■ Findings of fact are reviewed under the clearly erroneous standard. *Leslie v. Estate of Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999).

"A [finding of fact] is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." [A finding of fact] is also clearly erroneous when "the record lacks substantial evidence to support the finding." "We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."

*Id.* (quoting *State v. Kotis*, 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999) (bracketed material and citations omitted)).

■■■ Conclusions of law, on the other hand, are "not binding upon an appellate court and [are] freely reviewable for [ ] correctness." *Chun v. Bd. of Trs. of the Employees' Ret. Sys. of the State of Hawai'i*, 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005) (quoting *Allstate Ins. Co. v. Ponce*, 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004)) (internal quotation marks omitted). Ordinarily, conclusions of law are reviewed under the right/wrong standard. *Id.* Where a conclu-

**160**

sion is supported by the trial court's findings and reflects an application of the correct rule of law, it will not be overturned. *Id.* "[A conclusion of law] that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case." *Id.* (internal quotation marks omitted).

## IV. DISCUSSION

At the core of this appeal is the circuit court's determination that Bischoff had elected rescission. In arriving at its judgment, the circuit court explained, in its fourth conclusion of law: [6]

The court finds that [Bischoff] rescinded both the November Agreement and the December 10, 1999 Territory Release Agreement between the parties. A party rescinds a contract by manifesting his intent to do so, and a formal or written notice of rescission is not necessary. *See* 17A Am.Jur.2d § 584; *see also Robb v. Vos,* 155 U.S. 13, 43, 15 S.Ct. 4, 39 L.Ed. 52 (1894) ("any decisive act by a party, with knowledge of his rights and of the facts, determines his election in the case of inconsistent remedies ..."). [Bischoff] manifested his intent to rescind the contract by: (1) taking back the Realty Executives franchise sold to [Cook]; (2) brokering a franchise within [Cook]'s exclusive territory to Annette Aiona; (3) operating Realty Executives real estate sales offices and engaging in real estate sales on the Big Island; and (4) taking back "control" and resuming use of the telephone and facsimile numbers that were sold to [Cook]. [Bischoff] considered the Agreement between [Cook] and himself "no longer in force" as of approximately September 2001. Such actions are inconsistent with the terms of the contract and the affirmance thereof.

In reaching this conclusion, however, the circuit court failed to decide whether a

breach, or any other grounds for setting aside the agreement, had occurred. Consequently, the circuit court failed to provide a basis for concluding that rescission applied.

■■■ Plainly stated, the remedy of rescission is an avoidance of a transaction, the extinguishment of an agreement such that in contemplation of law it never existed, even for the purpose of being broken. *Griggs v. E.I. DuPont de Nemours & Co.,* 385 F.3d 440, 445–46 (4th Cir.2004); *Bossie v. Boone County Bd. of Educ.,* 211 W.Va. 694, 698, 568 S.E.2d 1, 5 (2002). In application however, the term "rescission" carries with it a "confusion of vocabulary." *United States v. Scruggs,* 356 F.3d 539, 545–46 (4th Cir.2004) (citing 2 Arthur Linton Corbin, *Corbin on Contracts* (Corbin) § 6.10, at 291 (rev. ed.1995)) (internal quotation marks omitted). The meaning of rescission varies "depending on what caused the contract to end." *Id.* (quoting 7 Corbin § 28.26, at 107–08 (rev. ed.2002)) (internal quotation marks omitted). For instance, if a contract ends because of a party's breach, damages are still owed. *Id.* However, if a contract is ended because of mistake, duress, or incapacity, then only a right of restitution exists. *Id.* at 545 n. 2. If a contract ends by mutual agreement, then the remedies available are shaped by the terms of the agreement. *Id.* at 545.

■■■ The foundation for the confusion over the term "rescission" comes from before the courts of law and equity merged. *See Griggs,* 385 F.3d at 445 n. 2. At that time, rescission had separate legal and equitable incarnations. *Id.* at 445. The right to legal rescission arose where the party seeking the rescission had grounds justifying a unilateral avoidance of a contract. *Id.* at 445; *Castleglen, Inc. v. Resolution Trust Corp.,* 984 F.2d 1571, 1584 (10th Cir.1993); *see* 13 Corbin § 67.8, at 47 ("unilateral rescission ... arises because of incapacity, such as infancy, or the inducement of assent through misrepresentation, or undue influence" (internal quotation

6. In bringing this appeal, Bischoff challenges the circuit court's fourth conclusion of law. The only finding of fact that Bischoff challenges is finding of fact number 43, which states:

No evidence was submitted during trial as to the value of Realty Executives Hawaii as of

September 2001, the time that [Bischoff] considered the Agreement between [Bischoff] and [Cook] was no longer in effect and started operating as Realty Executives Hawaii.

marks omitted)). The rescission occurred when the party attempting to rescind the contract gave "notice to the defendant that the transaction [had] been avoided and tender[ed] to the defendant the benefits received by the plaintiff under the contract." *Griggs*, 385 F.3d at 445–46; *Castleglen*, 984 F.2d at 1584. Rescission at law, therefore, was accomplished by the parties without the aid of the court. *Id.*

■ Once it was properly executed, legal rescission "extinguishe[d] [the rescinding party's] right to specific performance, including his [or her] right to any unpaid installments of the contract price[.]" 12 Corbin § 1131, at 141–42. It also extinguished the non-rescinding party's interest in any benefits conferred by the contract and required the return of any benefits to the rescinding party, restoring the parties to the positions they originally held. *Id.* If, however, the non-rescinding party did not give back the conferred benefit voluntarily, the rescinding party could sue for its return. *Griggs*, 385 F.3d at 446. Although legal rescission was accomplished when the party seeking rescission gave notice and tendered return of the consideration, a court order might have been necessary to give rescission practical effect. *Castleglen*, 984 F.2d at 1584; *see Maumelle Co. v. Eskola*, 315 Ark. 25, 29, 865 S.W.2d 272, 274 (1993); *see also Bishop Trust Co., Ltd. v. Kamokila Dev. Corp.*, 57 Haw. 330, 333–34, 555 P.2d 1193, 1196 (1976).

■ Equitable rescission, on the other hand, was "not a suit based upon the rescission already accomplished by the plaintiff, but a suit to have the court decree a rescission." *Griggs*, 385 F.3d at 446 (quoting *Handbook on Remedies* § 4.8 at 294) (internal quotation marks omitted). Equitable rescission was "effected by the decree of the equity court" and not by the conduct of the parties prior to the law suit. *Id.* (quoting *Haumont v. Security State Bank*, 220 Neb. 809, 816, 374 N.W.2d 2, 7 (1985)). The court "entertain[ed] the action for the express purpose of rescinding the contract and rendering a decree granting such relief." *Id.*

■ Adding to the confusion is the relationship between rescission and the doctrine of election of remedies. *See* 13 Corbin § 67.8(8) at 74–76. "[E]lection of remedies is the act of choosing between two or more concurrent but inconsistent remedies based upon the same state of facts." *Cieri v. Leticia Query Realty, Inc.*, 80 Hawai'i 54, 71, 905 P.2d 29, 46 (1995) (quoting *Wallis v. Superior Court*, 160 Cal.App.3d 1109, 1114, 207 Cal.Rptr. 123 (1984) (overruled on other grounds)). Rescission involves the abrogation or disaffirmance of the contract whereby, through restitution, the parties are returned to the *status quo ante.* 13 Corbin § 67.8(8) at 74. Historically, recovery based on disaffirmance of an agreement was seen as being wholly inconsistent and incompatible with recovery based upon the affirmance of the contract, such as a demand for damages. *Id.* at 75. As such, recovery of inconsistent remedies, those based on disaffirmance and affirmance, was prohibited. *Id.* Due to historic particularized pleading requirements in courts of law, this preclusion often accrued at the pleading stage. *Id.*

■ With the merger of law and equity the distinctions between the forms of remedies have blurred. 13 Corbin § 67.8(8) at 74–76. Moreover, with the introduction of liberalized pleading standards, the doctrine of election of remedies has also changed. *Id.* Rescission has become a catchall term for a variety of different, seemingly inconsistent remedies, *Scruggs*, 356 F.3d at 545, none of which need to be pleaded at the outset of litigation.

In an attempt to clarify the numerous different remedial awards that have shared the title "rescission," both the Uniform Commercial Code (UCC), as adopted in Hawai'i pursuant to HRS § 490:2–209 (1993), and the Restatement (Second) of Contracts (Restatement) (West Premise CD–ROM, current through August 2007) employ a new nomenclature. *Scruggs*, 356 F.3d at 545. The term "rescission" has been recast as a specific term of art, only applying "to the abandonment of a contract by 'mutual consent.'" *Id.* (citing UCC § 2–209 cmt. 3 (1989)); HRS § 490:2–209 cmt. 3; Restatement § 283 & cmt. a (1981). As such, the terms of the abandonment of the agreement are governed by the agreement reached by the parties.

Where a party voids a contract on such grounds as incapacity, fraud, duress, mistake,

breach of warranty or other promise that justifies putting an end to the contract, the party has exercised "avoidance." *Scruggs*, 356 F.3d at 545 n. 2; Restatement § 7 cmt. b. *But see Exotics Hawaii–Kona, Inc. v. E.I. Du Pont De Nemours & Co.*, 116 Hawai'i 277, 291, 172 P.3d 1021, 1035 (2007) (using the term rescission). Where a contract has been avoided, the plaintiff is asking only that the contract be declared null and void and that restitution be awarded. *Scruggs*, 356 F.3d at 545 n. 2; 7 Corbin § 28.26 at 107.

When one party ends the contract because of a material breach of the agreement by the other party, the contract has ended by cancellation. *Scruggs*, 356 F.3d at 545; UCC § 2–106(4); HRS § 490:2–106(4) (1993); Restatement § 283 cmt. a. Where a contract has been cancelled, "the cancelling party retains not only 'any right based on prior breach or performance' but also 'any remedy for breach of the whole contract or any unperformed balance.'" *Scruggs*, 356 F.3d at 545 (quoting UCC § 2–106(3)–(4)); 12 Corbin § 1131 at 140–46. Therefore, cancellation of the agreement does not "discharge a right to the agreed price of a performance already rendered by the party exercising the power or [any] right to damages for a breach that has been committed previously." 13 Corbin § 67.2 at 11 (citing UCC § 2–720).

Finally, agreements of rescission differ from terminations. A "termination" occurs when either party to an agreement unilaterally puts an end to the agreement, other than for its breach, pursuant to a power created by the agreement or by law. Restatement § 283 cmt. a; UCC § 2–106.

The role of the doctrine of election of remedies in shaping the remedies available from rescission has changed with regards to the preclusive disaffirmance/affirmance view of remedies. 13 Corbin § 67.8(8) at 74–76. The doctrine of election of remedies is not conceived as a rule of substantive law, but rather, it is "a technical rule of procedure or judicial administration[,]" and as such is governed by Hawai'i procedural law. *Airgo,*

*Inc. v. Horizon Cargo Trans., Inc.,* 66 Haw. 590, 593, 670 P.2d 1277, 1280 (1983) (quoting 25 Am.Jur.2d *Election of Remedies* § 1 at 647 (1966)) (internal quotation marks omitted).

"Under [Hawai'i's] liberalized rules of pleading and procedure[,] a party may state 'as many separate claims or defenses as [the party] has regardless of consistency and whether based on legal or on equitable grounds or on both.'" *Airgo,* 66 Haw. at 593, 670 P.2d at 1280 (quoting Hawai'i Rules of Civil Procedure (HRCP) Rule 8(e)(2)). "[A] party may also join 'as many claims, legal or equitable, as [the party] has against an opposing party.' These rules allow liberal joinder even of inconsistent claims." *Airgo,* 66 Haw. at 593–94, 670 P.2d at 1280 (quoting HRCP Rule 18(a)). Moreover, HRCP Rule 54(c) [7] adopts the approach used by the equity courts for all civil actions, so long as the defendant has not defaulted. Except as discussed below, "if the defendant has begun defending the action, adherence to the particular legal theories suggested by the pleadings is subordinated to the court's duty to grant the relief to which the prevailing party is entitled, whether it has been demanded or not." *Chambrella v. Rutledge,* 69 Haw. 271, 285, 740 P.2d 1008, 1016 (1987) (quoting 10 C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2664 at 146 (1986)) (internal quotation marks and ellipses omitted).

In light of this procedural roadmap, a plaintiff is not ordinarily required, "and cannot be compelled, to elect between inconsistent remedies during the course of trial." *Cieri,* 80 Hawai'i at 71, 905 P.2d at 46 (quoting *Wallis,* 160 Cal.App.3d at 1114, 207 Cal.Rptr. 123). However, where "a plaintiff has unequivocally and knowledgeably elected to proceed on one of the remedies [the plaintiff] is pursuing, [that plaintiff] may be barred recourse to the other ... inconsistent remed[ies.]" *Id.* (emphasis omitted). In reaching this holding, the Hawai'i Supreme Court relied on the California case of *Wallis.* According to *Wallis,* the doctrine of election

---

7. Hawai'i Rules of Civil Procedure Rule 54(c) states: "Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings."

of remedies is based on the principle of estoppel. *Wallis*, 160 Cal.App.3d at 1114, 207 Cal.Rptr. 123.

> Whenever a party entitled to enforce two remedies either institutes an action upon one of such remedies or performs any act in the pursuit of such remedy, whereby he has gained an advantage over the other party, or he has occasioned the other party any damage, he will be held to have made an election of such remedy, and will not be entitled to pursue any other remedy for the enforcement of his right.

*Id.* at 1114–15, 207 Cal.Rptr. 123 (quoting *De Laval Pac. Co. v. United Cleaners' & Dryers' Co.*, 65 Cal.App. 584, 586, 224 P. 766 (1924)) (internal quotation marks omitted).

According to Black's Law Dictionary,

> A remedy is anything a court can do for a litigant who has been wronged or is about to be wronged. The two most common remedies are judgments that plaintiffs are entitled to collect sums of money from defendants and orders to defendants to refrain from their wrongful conduct or to undo its consequences. The court decides whether the litigant has been wronged under the substantive law; it conducts its inquiry in accordance with the procedural law. The law of remedies falls somewhere between substance and procedure, distinct from both but overlapping with both.

*Black's Law Dictionary* 1320 (8th ed.2004) (quoting Douglas Laycock, *Modern American Remedies* 1 (3d ed.2002)).

■ Beyond the base requirement that there be some actual harm to be redressed, all of the "rescission" remedies discussed so far have particularized requirements as to the underlying harm giving rise to that remedy. "Within the meaning of the law, 'rescission' does not mean an annulment that is definitively accomplished by unilateral pronouncement. Rather, it contemplates a remedy that restores the *status quo ante*." *Ray v. Citifinancial, Inc.*, 228 F.Supp.2d 664, 667 (D.Md.2002). "Rescission is only a remedy,

not a cause of action." *Zola v. Gordon*, 685 F.Supp. 354, 374 (S.D.N.Y.1988). Therefore, there must be grounds upon which to support the award of rescission.

■ Here, despite ruling in favor of Cook on Bischoff's claim, the circuit court found that Bischoff had elected the remedy of rescission. However, at no point in its Order did the circuit court find or conclude that Cook had committed a breach of contract, let alone a material breach, or identify any other ground for abrogating the contract. As such, there is no support in the court's Order for the determination that the remedy "elected" by Bischoff was warranted.

Conversely, although there are findings of fact that tend to indicate that the circuit court concluded Bischoff may have committed a breach of contract, there is no conclusion of law to that effect or that any breach was material. Thus, even construing the remedy as being awarded to Cook, the circuit court's conclusions do not reflect its findings.

■ Cook's argument that there was no need to find she breached the Agreement because Bischoff had "disaffirmed" the contract is meritless. Irrespective of the precise form of historical rescission meant by the term "disaffirmed," without the court finding some facts supporting the conclusion of law that a "disaffirmance" has occurred, there is no basis for the court to award any remedy.

■ Moreover, even assuming the circuit court believed that a remedy was warranted, the record does not establish that Bischoff made an unequivocal and knowledgeable election to rescind or avoid the contract. Rather, it appears undisputed in the record that Cook committed a material breach of the contract when she failed to make the July 1, 2001 payment and when she subsequently told Bischoff, through Walls, that she "did not owe him" the remaining payments on the agreed-upon sales price for the business. In response to this, Bischoff invoked the acceleration clause in the contract by filing a claim for breach of contract.[8] Thus, Bis-

---

8. As explained in *Bank of Hawaii v. Kunimoto*, 91 Hawai'i 427, 433, 984 P.2d 1253, 1259 (App. 1997), an "optional" acceleration clause, as opposed to an "automatic" acceleration clause, is a "provision in a bill or note accelerating the maturity thereof on nonpayment of interest or instalments [sic], or other default, at the option of the holder[.]" Under such a clause, the holder of the option is given a choice of whether or not to accelerate the maturity date of the note. *Id.* Thus, as a general rule, a party exercising its option to accelerate must take some affirmative

choff's suit clearly manifested an intent to proceed on a theory that the contract had been cancelled due to Cook's material breach. In light of Cook's breach, Bischoff was entitled to "the agreed price of a performance already rendered" by Bischoff and to damages for the breach. 13 Corbin § 67.2 at 11.

Contrary to the circuit court's conclusion of law, it does not appear that Bischoff manifested an intent to "take back" the business he sold to Cook after she breached. The undisputed evidence presented at trial established that, after Cook had stopped making payments on the Agreement, she communicated to Bischoff that she no longer intended to make payments, terminated the lease on the REBIC office, fired her remaining agents, and tried to have the Numbers transferred to her home. Only then, after Cook had breached the Agreement and discharged her agents, did Bischoff sign on the discharged agents to sell real estate.[9]

■ Once Cook materially breached her Agreement with Bischoff by failing to make payments, Bischoff was entitled to invoke the acceleration clause and was not required to continue to perform his sole remaining obligation under the Agreement, i.e., the promise not to compete. Restatement § 243; *Scruggs*, 356 F.3d at 545–46; *see also Ward v. Am. Mut. Liab. Ins. Co.*, 15 Mass.App.Ct.

98, 100, 443 N.E.2d 1342, 1343 (1983) ("It is well established that a material breach by one party excuses the other party from further performance under the contract."). Bischoff was entitled to recover the entire contract price to put him in the same position he would have enjoyed had Cook fully performed. *See Cities Service Helex, Inc. v. United States*, 211 Ct.Cl. 222, 543 F.2d 1306, 1313 (1976) and authorities cited therein.

The ensuing action does not establish an election of rescission because the parties did not abandon the Agreement by mutual consent. Thus, the circuit court's conclusions of law 4, 5 and 7 are wrong insofar as they hold that Bischoff's actions subsequent to Cook's breach established an intent to rescind the Agreement.

Finally, the circuit court arrived at the decision to award the remedy of rescission after the conclusion of the bench trial. As a result, Bischoff was not afforded an opportunity to put on evidence for a remedial award other than the damages he prayed for in his initial pleadings. The circuit court's finding that there was no evidence of the value of REH at the time of Cook's breach is literally correct but immaterial. Bischoff's complaint was for damages under the Agreement, that is to say, the balance due on the contract plus interest and attorney's fees and costs.

action to exercise his or her option, such as filing a law suit. *Id.*

9. Bischoff testified that, prior to this point, he only managed, rather than sold, real estate under his Realty Executives Hawaii (REH) company. Cook acknowledged that she did not know of any sales made by REH between November 1999 when the Agreement was entered into and September 10, 2001.

Cook and the circuit court made much of Bischoff's failure to "transfer" the office phone numbers (Numbers) to Cook during the lifetime of the Agreement. It is true Bischoff was obligated to transfer the Numbers to Cook under the Agreement. However, initially, neither party was aware that the telephone company had not, in fact, transferred ownership of the Numbers to Cook. The circuit court's finding that Bischoff was aware that ownership of the Numbers had not been transferred to Cook when she moved Realty Executives Big Island Corporation (REBIC) to the King Kamehameha Mall location is equally applicable to Cook, as she testified that she needed Bischoff's assistance with the tele-

phone company when she made that move. In light of Cook's own testimony that she had use of the Numbers while she ran REBIC and the failure to transfer those Numbers to her name did not contribute to her decisions regarding REBIC, this breach was not material. *See* Restatement § 241 (factors used in evaluating materiality of nonperformance).

Moreover, it is also undisputed that Cook never objected to or otherwise brought to Bischoff's attention that she considered this failure a material breach of their Agreement. Again, both parties were aware that the telephone company had not transferred ownership of the Numbers as early as her move to King Kamehameha Mall. Cook did not demand performance, nor did she communicate to Bischoff that she believed his failure constituted a material breach of their Agreement until after she breached their Agreement herself by failing to make payments and stating she did not intend to make future payments. Cook also continued to make payments on the Agreement after the King Kamehameha Mall move. Thus, Bischoff's failure to cause transfer of the ownership of the Numbers was excused. *See* Restatement § 247

We hold Bischoff is entitled to those damages subject to any set-offs for property returned[10] by Cook to Bischoff. *See* Restatement § 347.

## V. CONCLUSION

Based on the above analysis, the Circuit Court of the Third Circuit's June 1, 2004 judgment is vacated and the matter is remanded for proceedings consistent with this opinion.

---

**10.** No set off need be awarded for damages caused by Bischoff's failure to complete performance of his contract obligations, i.e., the "do not compete" clause. *Ward v. Am. Mut. Liab. Ins.*

*Co.,* 15 Mass.App.Ct. 98, 101, 443 N.E.2d 1342, 1344 (1983) (citing Restatement §§ 241–43).